**RELIANCE MFG. CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 7580.

Circuit Court of Appeals, Seventh Circuit.

Dec. 20, 1941.

Rehearing Denied Feb. 12, 1942.

Paul Y. Davis, Ernest R. Baltzell, Wm. G. Sparks, and Gustav H. Dongus, all of Indianapolis, Ind., for petitioner.

Herbert S. Thatcher, Joseph Padway, and Robert A. Wilson, all of Washington, D. C., for intervenor.

Robert B. Watts, of Washington, D. C., and I. S. Dorfman, of Chicago, Ill., and Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Owsley Vose, Jacob I. Karro, and Margaret Holmes McDowell, Attys., National Labor Relations Board, all of Washington, D. C., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition for review of a decision of the N. L. R. B., issued January 9, 1941. The Board requests enforcement of its order.

Petitioner, an Illinois corporation, with its principal office in Chicago, directly or through wholly owned subsidiaries, operates plants for the manufacture and sale of wearing apparel (mens' shorts, unionsuits, pajamas, pants, shirts, robes, lumber jackets and mackinaws; womens' dresses, robes, play suits, slips and flannelette garments) in many states. Eight of these plants—those involved in the instant proceeding—are located in Bedford, Michigan City, Columbus, Seymour, Mitchell and Kokomo, Indiana; Tyrone, Pennsylvania and Huntington, West Virginia. The Board's jurisdiction is conceded.

Between July 1937, and March 1938, a number of charges and amended charges were filed against the petitioner by the Amalgamated Clothing Workers of America (called "Amalgamated" herein), the United Garment Workers of America (called the "United" herein) and the International Ladies Garment Workers Union (called "International" herein). The various charges concerned the numerous plants of petitioner, singly, rather than collectively. Hearings were commenced by the Board in a number of cities where plants were located, and on April 5, 1938, the Board issued its consolidated complaint and subsequently conducted hearings thereon in a number of cities where plants were located, and also in Chicago, Illinois, where such hearings were concluded July 13, 1938. Subsequent to the Board's decision, a plant located at Washington, Indiana, was by order of the Board, severed, and pursuant to stipulation, a consent decree, in settlement, was entered by this court on July 9, 1941.

The Board made findings with reference to each of the plants involved in the instant proceeding. While the same unfair labor practices were not found as to each, in the total petitioner was found guilty of violating Sections 157 and 158 (1), (2), (3) and (5), 29 U.S.C.A. Petitioner was also exonerated on a number of charges contained in the consolidated complaint.

The record is voluminous and we are presented with the difficult problem of doing justice to the parties in an opinion of reasonable length. Petitioner presents and argues 33 contested issues, many of which are dependent upon the contention that the

findings of the Board are without substantial support. In view of our limited authority in this respect, we shall discuss such issues only as we are convinced from a study of the record and briefs, are meritorious. Petitioner also raises certain questions of law, including provisions of the Board's enforcement order, which require decision. In their briefs, both parties have argued their respective contentions separately as to each of the plants involved. We shall do likewise, and consider them in the order of the Board's presentment.

### Michigan City.

 At this plant the Board found that petitioner had engaged in unfair practices in violation of Section 8 (1), (2) and (5) of the Act. As to (1) and (2), the finding of the Board is, not only substantially, but conclusively, supported. We shall, therefore, make brief reference only to the testimony in support thereof. Organizers for the Amalgamated began the solicitation of members in April 1937. Plant Superintendent Hubbard summoned Brown, Personnel Director for all of petitioner's plants, who arrived in Michigan City shortly thereafter. He arranged for interviews with small groups of employees and bitterly denounced the C. I. O. and labeled its organizers as "a bunch of crooks and hoodlums," and "reds, radicals and Bolsheviks." It was suggested to the employees that the plant would close if they joined the C. I. O., that they should form a union of their own, and that no other form of organization was acceptable to petitioner. One employee was offered a vacation with all expenses paid if she would start an inside union. An employee from petitioner's Kokomo plant, by the name of Musselman, was introduced to the employees as a representative of the A. F. of L. whose chief business was to disparage the C. I. O. Petitioner's Vice-President Bard made a speech to the employees in which they were told that petitioner would not sign a contract with the Amalgamated unless its competitors did likewise. While the speech in itself can not be seriously condemned, it, taken in connection with the surrounding circumstances, not only discloses petitioner's attitude toward the Amalgamated, but forcibly conveyed to the employees the idea that petitioner would not recognize it under any circumstances. One Crowmer, who started out as an organizer for the Amalgamated, was secretly employed by petitioner as an industrial relations counsellor, at a salary of $350 per month. His business was to disparage outside unions and to lay the groundwork for an independent organization. He made reports to petitioner concerning the activities of Amalgamated's organizers, and the names of the employees who joined and attended its meetings. On June 25, 1937, after notifying newspaper reporters and photographers, Crowmer burned 432 cards which he claimed were membership cards in the Amalgamated. This occurred on a lot across the street from petitioner's plant with the knowledge, and we think, approval of petitioner's officials. Petitioner contends it is not liable for the acts of Crowmer. We think the Board properly found to the contrary.

 The evidence in support of the Board's finding that petitioner dominated and interfered with the formation of the Michigan City Independent Union, standing alone, is not of a convincing nature, but taken in connection with petitioner's attitude toward outside unions, we think, is sufficient. The evidence that petitioner offered special inducements to some of its employees to quit the C. I. O. and work for an inside union in connection with the secret arrangement it made with Crowmer, a former C. I. O. organizer, to do likewise, together with other circumstances not necessary to relate, justified the finding of interference. It is argued here, however, as it is with a similar situation at some of the other plants, that there is no evidence of domination. To us this point is immaterial, as proof of domination is not necessary to constitute a violation of 8 (2). Interference alone is sufficient.

We shall now consider the Board's finding that petitioner refused to bargain with the Amalgamated in violation of Section 8 (5). In order to sustain this charge, it was necessary to establish (1) that Amalgamated had a majority of the employees of an appropriate unit, and (2) that it made a demand or request of petitioner for recognition. Petitioner contends that there is no substantial evidence in support of the Board's affirmative findings relative thereto. While the evidence in support of the first proposition is of a rather dubious character, we are of the opinion that it is sufficient to sustain the Board's conclusion. An organizer for the Amalgamated testified that he procured the signatures to membership cards of about 350 employees, which

was a large majority. True, his testimony appears to have been contradicted by other Board witnesses, but it was within the Board's province to appraise the conflicting evidence.

■ The Board found that "* * * on July 10, 1937, and at all times thereafter, the respondent refused to bargain with the Amalgamated as the exclusive representative of its employees in the appropriate unit with respect to wages, hours of employment and other conditions of work. * * *" In our judgment, there is no competent evidence to support the proposition that petitioner was requested, on July 10, 1937, or any subsequent time, to bargain with the Amalgamated. "* * * The employer can not, under the statute, be charged with refusal of that which is not proffered." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 298, 59 S.Ct. 501, 504, 83 L.Ed. 660. In other words, the statute imposes upon the union the affirmative duty of requesting recognition before the employer can be found guilty of refusing. We assume that the statement in the Board's brief in respect to this situation is as favorable to it as the circumstances will permit. According to such statement, a committee of the union, on July 3, 1937,[1] requested Rheinhart Fedder, the Mayor of Michigan City, to arrange a conference between the Amalgamated and A. T. Bard, petitioner's Vice-President. We quote from the Board's brief:

"* * * One of the purposes of this conference was to obtain assurances from Bard that there would be no discrimination against members of the Amalgamated when work resumed; however, the members of the Amalgamated committee which conferred with Fedder testified that they also requested him to inform Bard that the Amalgamated desired to be recognized by petitioner as the majority representative of the employees and that Fedder promised to communicate this request to Bard. On July 10, 1937, Fedder informed the Amalgamated committee that Bard had refused to confer with it for any purpose, assigning as Bard's reason the fact that petitioner had already decided to reopen the plant pursuant to a conference with the Banner Independent. * * *"

Fedder, a Board witness, denied that he had so informed the Committee or that he had ever conferred with Bard concerning recognition. The Board gave credence, so it says, to the testimony of the committee in preference to that of Fedder. It is argued that Fedder was the constituted agent of the committee and that petitioner, through Fedder, refused the union's request to bargain. Obviously, this testimony fails to prove anything so far as the petitioner is concerned. At most, a question of veracity was raised between the committee and its agent Fedder. Reconciliation of such a conflict is of no assistance to the Board's position. Without denial on the part of Fedder, it could not be held that a request of him on the part of the committee, not communicated to petitioner, was binding upon the latter. Certainly there is no room for argument that an affirmative act required of a principal is established by mere proof that its performance was delegated to an agent. It must be further shown that the agent executed his principal's instructions. Here the agent denied not only execution, but also the delegation of authority. In its decision the Board refers to certain telephone conversations and a letter addressed to petitioner, which are not mentioned in the Board's brief for the obvious reason that they afford no support for the finding in question.

■ The complaint charged that the closing of petitioner's plant at Michigan City on June 18, 1937, was a lock-out, and that discrimination was practiced in the rehiring of approximately 150 employees alleged to have been locked out. The Board dismissed the lock-out, as well as the discrimination charge, as to all except six employees. It found that when the plant was reopened July 12, petitioner took back approximately the same proportion of Amalgamated members as had worked prior to the closing. The discrimination found against six of the employees in violation of Section 8 (3) of the Act was based largely on the fact that they had been active in the affairs of the Union, and when work was resumed, non-union persons with no experience were employed. We are of the opinion, under the circumstances of the instant case, that the unexplained hiring of inexperienced non-union employees in preference to union employees active in the affairs of the union, is sufficient to create a reasonable inference of discrimination. Montgomery Ward & Co. v. National Labor Rela-

---

[1] At this time the plant had been closed down since July 18, 1937, as will be referred to hereinafter.

tions Board, 7 Cir., 107 F.2d 555, 560. We do not agree with petitioner's contention that such a conclusion has the effect of shifting the burden of proof. The Board's finding in this respect is sustained.

Petitioner also contends that the following requirement is in excess of the Board's authority:

"Upon application place all persons listed in Appendix G and not yet reinstated upon a preferential list and offer them employment in the manner set forth in the section entitled 'The Remedy.' "

Under that portion of the Board's decision entitled "The Remedy," the following mode of reinstatement is provided:

"* * * In view of the respondent's demonstrated antipathy to the Amalgamated, however, we shall require the respondent to place the Amalgamated members named in Appendix G and not yet reinstated by it, on a preferential list, the employees to be listed in order in accordance with the respondent's previous practice in making lay-offs or in rehiring, giving due regard to seniority, ability, and other factors usually considered, and without any discrimination because of union activity. Thereafter, in accordance with such list, the respondent shall offer employment in former or substantially equivalent positions at its Michigan City plant to employees on the list in the order which the employees are listed as soon as such employment becomes available, without discrimination against any employee because of union affiliation or activity."

There are 115 persons listed in Appendix G, all of whom were members of the Amalgamated June 18, 1937, when petitioner's plant was closed. As already noted, the Board exonerated petitioner of the charge that such closing was a lock-out, and found that petitioner "did not discriminate as to the hire and tenure of employment of its employees at Michigan City by locking them out on June 18, 1937." It also exonerated petitioner of any discrimination in the rehiring of its employees upon the opening of its plant except as to six employees, previously referred to. In other words, the 115 Amalgamated members required upon application to be listed in Appendix G, were unemployed for lawful reasons so far as petitioner was concerned. The Board argues that this requirement "merely enjoins petitioner from discriminating against the members of the Amalgamated in increasing its working force, is a proper exercise of the Board's 'judgment and discretion * * * in choosing the particular affirmative relief to be ordered.' " The effect of such order, in our judgment, is far broader than that stated by the Board. It not only enjoins discrimination against employees who the Board found had not been discriminated against, but requires discrimination in their favor and against other employees whose names are not required to be placed upon this list.

We do not find any disclosure in the record as to the number of persons given employment when petitioner reopened its plant. It is disclosed, however, that at the time of the closing, it had at least 475 employees, of whom 328 were claimed to be members of the Amalgamated. This means that at least 147 employees were not members. The Board found that petitioner rehired a fair proportion of union members. It is plain, therefore, that about one-third of the employees not rehired were not members of this union. We can see no reason why such employees, other things being equal, are any less entitled to re-employment than members of the Amalgamated who admittedly have not been discriminated against. If the order be construed as not giving members of the Amalgamated preference over other employees, then it is meaningless. The requirement which is for all time takes no consideration of the possibility of altered conditions. Any other union seeking to organize petitioner's employees would at once be met with the proposition that 151 occupy a preferred status by reason of membership in Amalgamated in 1937. The order is an effective interference with the right of the employees to join and select as their bargaining agent a union of their own choice, or to change such agent as they may desire. Petitioner contends that the order is punitive. We agree that it is, insofar as petitioner's employees are concerned, who were not members of the Amalgamated. The Board relies upon N. L. R. B. v. C. Nelson Mfg. Co., 8 Cir., 120 F.2d 444, 446, in support of this provision. The court there apparently proceeded on the theory that the order was valid because the Board had found it necessary to effectuate the policies of the Act. While the judgment of the Board is entitled to respect, we are of the view that the court, upon challenge, must determine whether a provision will effectuate the purpose of the Act. As was said in National Labor Relations Board v. Pennsylvania

Greyhound Lines, 303 U.S. 261, 265, 58 S. Ct. 571, 574, 82 L.Ed. 831, 115 A.L.R. 307:

" * * * Hence, upon the challenge of the affirmative part of an order of the Board, we look to the Act itself, read in the light of its history, to ascertain its policy, and to the facts which the Board has found, to see whether they afford a basis for its judgment that the action ordered is an appropriate means of carrying out that policy."

If the purpose of the Act is to furnish equal protection to all employees in their rights to organize and select a bargaining agent of their own choice, as we think it is, then the provision in question is an impairment rather than an aid to such protection. It is our judgment that the provision should not be enforced.

In connection with our discussion of the matters pertaining to the Michigan City plant, it appears appropriate to dispose of the contention that the United Garment Workers of America, Local No. 215 (called "intervenor" herein) is now the proper bargaining agent of petitioner's employees and entitled to recognition. Such recognition was requested of petitioner May 5, 1941, but was refused because of the Board's order requiring petitioner to bargain with Amalgamated. Intervenor, on May 22, 1941, petitioned the Board for investigation and certification pursuant to 9 (c) of the Act, 29 U.S.C.A. § 159(c), which petition was dismissed by the Board. Intervenor has filed its brief in this court and both it and the petitioner contend that even if the Board's order, requiring petitioner to bargain with Amalgamated, is sustained, that such order should be conditioned upon the Board ascertaining the proper bargaining agent, in view of the alleged altered circumstances. Inasmuch as we have held improper the Board's order requiring petitioner to bargain with the Amalgamated, it follows, so we think, that it is not necessary to decide the question presented by intervenor. Petitioner and its employees, so far as a bargaining agent is concerned, are in the same position, as though petitioner had not been required by the Board to bargain with Amalgamated.

### Columbus, Indiana.

There is much discussion in the briefs concerning the activities of a Citizens' Committee of about 100 business and professional men, organized in May, 1937, shortly after the Amalgamated started its organizational campaign. Admittedly, this committee was hostile to, and formed primarily for the purpose of combatting the Amalgamated, and its activities appear to have been confined largely to the employees of petitioner. A Grievance Committee was set up and employees were urged, at meetings called by the Committee, in newspaper advertisements and in handbills circulated through the plant and otherwise, to accept facilities offered by the Committee for the presentation of their grievances rather than those provided by Amalgamated. The employees were urged to join the Committee for the purpose of demonstrating their loyalty to the citizens and their employer. The Board found that petitioner, by aiding and assisting the Citizens' Committee, interfered with, restrained and coerced its employees in violation of Section 7 of the Act. The Board also found that "Superintendent Shepherd and other supervisory employees at the Columbus plant signed such cards, asked various employees to sign them, and permitted widespread solicitation and signatures on the premises of the plant during working hours." Petitioner does not dispute this finding but contends that such activity did not constitute an unfair labor practice. There is no merit in this contention. Of course, the Citizens' Committee had a right by any lawful means to combat the activities of the Amalgamated. They undoubtedly thought they were justified in so doing, and, in fact, might have been. The record, however, plainly discloses that petitioner actively assisted and cooperated with the Citizens' Committee in its anti-union campaign. As an aider and abettor, it became chargeable with the activities of the Citizens' Committee. It is beside the issue to point out that the Citizens' Committee was within its rights. What the Board has condemned, and we think properly, is the active assistance given the Committee by petitioner.

The Board also found that petitioner violated 8(1) by participating in the eviction from town of an Amalgamated organizer, and by the discharge of one Pauline McComas for the reason that she joined the union. We are satisfied the evidence justifies these findings. There is no occasion for us to discuss it. We pause, however, to briefly refer to the undisputed fact that a woman organizer for the union was forced to leave town and warned not to return. The only controversy there can be concerning this incident is petitioner's contention that it was not responsible. If this

incident stood alone, there might be some merit in the contention. Taken in connection with the general situation, however, and the fact that numerous of petitioner's employees participated, including one who had a supervisory status, even though of a limited character, we think it may be strongly inferred, not only that petitioner had knowledge, but that it gave its tacit approval to a flagrant act of interference.

The Board found that petitioner sponsored the organization of the Columbus Independent Union and dominated and interfered with its management and control. Petitioner tacitly concedes the validity of this finding insofar as assistance is concerned. It disputes, however, that there was any evidence of domination. As stated heretofore concerning a similar contention with reference to the Michigan City plant, we do not believe it makes any difference so far as the Board's order is concerned.

Petitioner was also found to have violated 8(3) in regard to hire and tenure. At this plant there were 31 employees named in the complaint. The Board dismissed the charges as to 16 and found discrimination as to 15. About September 15, 1937, petitioner, for valid reasons, curtailed its operations and laid off all but a small number of its employees. In January, 1938, operations were greatly increased, and shortly thereafter were back to normal. Here, as at Michigan City, a number of new employees were hired in preference to those found to have been discriminated against. Here also petitioner seeks to justify its refusal to hire old employees, members of the Union, for the reason that they had formerly been employed in divisions of its plant where their services were not needed when operations were fully resumed. In other words, that no inference arises from the fact that new employees were hired for particular work which the old employees were not familiar with because they had previously been employed in other kinds of work. We have considered the evidence with reference to each of these employees, and while we are of the view that it furnishes rather scant support for the Board's finding, we are not prepared to say that it is not sufficient. The hostile attitude and the numerous unfair acts charged and found against petitioner cast a grave reflection upon its explanation as to why positions were given to new, rather than old, employees.

Kokomo, Indiana and Huntington, West Virginia.

In its decision the Board made separate findings with reference to each of these plants. It has considered them together in its brief. Petitioner complains that by doing so, deficiencies in proof at one plant are supplied by evidence as to the other. We do not think this is a valid criticism for the reason that the findings and evidence in support thereof are quite similar as to each of these plants. Of course, evidence as to one plant should not and, we understand, has not been considered in connection with the other. As to each plant, the Board found that petitioner had violated 8(1), (2) and (3) of the Act. At each of these plants, the International commenced organizational activities in June, 1937. Here again petitioner's argument is predicated largely upon the theory that it was not responsible for certain employee activities, including some of its supervisory officials, against the International. In its decision, as well as in its brief, the Board stresses the activities of members of the Employees' Mutual Benefit Societies at each plant. A number of supervisory officials were members of these societies. It is not necessary to detail the activities of the societies in combatting the International and the assistance rendered the formation of an independent union at each plant. It is sufficient to state that they constituted a marked interference with the organization drive of the International and with the formation of the independent unions. We also are of the opinion that petitioner was properly held responsible for such activities. We think it is more than a fair inference that petitioner utilized these societies to interfere with the rights of their employees just as it utilized the Citizens' Committee for a like purpose at other plants. There is evidence that petitioner, acting through these societies, as well as by supervisory officials, carried on an active campaign against the International and in behalf of the independent at each of the plants.

At Kokomo, 16 employees were included in the charge of discrimination as to hire and tenure. The Board exonerated petitioner as to 10 and sustained the charge as to 6. At Huntington, petitioner was charged with discrimination as to 31 employees and found guilty as to 4[2] only. At

2 The Board in its back pay and reinstatement order, however, included one Marian Kendrick, which it now concedes was an error and that her name should be omitted.

each of these plants, as well as other plants of petitioner, the number of employees, for business reasons, was greatly reduced in the latter part of 1937. By spring of the fol-. lowing year, business was such as to necessitate an increased force. Instead of taking back its old employees, however, petitioner hired new ones. Included in the former are those found to have been discriminated against. What we have said concerning a similar situation at Michigan City is applicable. We see no reason to disturb the findings of the Board as to the discriminatory conduct of petitioner in violation of 8(3) at each of these plants.

 The Board's order required that petitioner reimburse members of the Huntington Independent Union for dues and assessments deducted from their wages. Petitioner contends that this order is beyond the power of the Board. We have so held in N. L. R. B. v. J. Greenebaum T. Co., 7 Cir., 110 F.2d 984, 988, and in A. E. Staley Mfg. Co. v. N. L. R. B., 7 Cir., 117 F.2d 868. Thus, at the time of the Board's decision, it was the law of this Circuit and we think the Board should have followed it. Our holding on this question has been approved in Western Union Tel. Co. v. N. L. R. B., 2 Cir., 113 F.2d 992, 997, and N. L. R. B. v. Continental Oil Co., 10 Cir., 121 F.2d 120, 125.

### Seymour, Indiana and Tyrone, Pennsylvania.

Petitioner was found to have violated Sections 8(1) and (2) of the Act at each of these plants. At each place local business men became active in repelling the organization of the employees by Amalgamated. At Tyrone, a meeting of business men was attended by Plant Superintendent Kirby, at which it was suggested that the organizers be requested to leave town. They were subsequently questioned and told to get out of town. The supervisors in the plant were advised in the presence of Superintendent Kirby to keep their eyes and ears open and to report to him any union activity. When it was suggested to him that foremen were "not supposed to have anything to do with it," Kirby replied: "Theoretically we are not, but that is not practical." There is also evidence that Kirby told foremen that petitioner would not tolerate any union activity.

At Seymour, a Citizens' Committee was organized whose activities in combatting the union were along the same lines as de-scribed heretofore at Columbus, and which also had petitioner's support. Personnel Manager Brown (over all of petitioner's plants), in talking to employees, referred to the Amalgamated as "nothing but Communists and Reds" and warned that if its organizers attended a Reliance picnic, they were likely to get hurt. One Crowmer, (referred to heretofore in our discussion concerning the Michigan City plant) for whose activities the Board properly found petitioner responsible, offered one union organizer $300 per month if he would report the names of the employees who had joined the union.

At these plants, as at others, independent unions were formed shortly after the outside union commenced to organize. There is evidence that the organizers for the Independents were permitted to leave their work for the purpose of consulting attorneys concerning the organization of such unions and that petitioner's plants were shut down on several occasions for the purpose of enabling employees to attend such organization meetings. We think the Board was justified in finding that petitioner violated 8(1) and (2) of the Act.

### Bedford and Mitchell, Indiana.

The Board found that petitioner violated 8(1) and (2) of the Act at its Bedford plant, and 8(2) at its Mitchell plant. At the latter plant it was exonerated as to the 8(1) charge. At the Bedford plant, employees who had joined the United were attacked by other employees and were refused admittance to the plant until they had destroyed their membership cards. On the following day, the United employees were again refused admittance to the plant. The Board concluded that the acts of the non-union employees had the approval of petitioner's supervisory employees, which conclusion, we think, is sustained by the record.

 On another occasion organizers for the United were given to understand that the plant would close before it would recognize the union, and one of the United organizers was offered $100 to cease all union activity and accept a transfer to another plant, which he accepted. Other persons active in the affairs of the United were transferred to other plants. Such conduct was an inexcusable discrimination against the United.

The Independent Union at Bedford appears to have been first suggested by one of petitioner's supervisory employees. At

about the same time the employees at Mitchell decided to organize an independent union. The Bedford Independent obtained a loan from petitioner of $1,000, payable in five years. The money was paid over to petitioner's plant superintendent as trustee, and all disbursements were subject to his approval. There is no doubt but that the evidence amply supports the Board's finding with reference to the independent union at Bedford. At Mitchell, however, we do not believe there is any substantial evidence to justify the Board's finding as to domination and interference with the independent union. In its decision as to this matter, the Board refers to a number of matters which, in our judgment, are irrelevant to the issue. It recites the fact that a number of petitioner's employees joined the Chamber of Commerce, and that the same attorney who assisted in forming the independent at Bedford, assisted at Mitchell. There is no finding and no claim that petitioner had anything to do with either of these incidents. It was also found that petitioner permitted the Mitchell Independent to sell Coca Cola and candy on its premises. This business, so the record discloses, was a financial failure. The Board also finds that the secretary of the Independent, subsequent to its organization, was permitted to tell the employees at a meeting on petitioner's premises that the plant would close unless the employees accepted a wage decrease. There is nothing to show that the secretary was acting on behalf of the Independent, and even if so, we are unable to believe that it was an act of interference or domination with the Independent. There is only one fact found by the Board which furnishes any support to the charge, and that is, on one occasion the employees were permitted to quit work before the regular time for the purpose of attending a meeting at which the officers of the Independent were elected. So far as we can ascertain from the record, there was only one forelady who approved of the employees quitting before the regular time. She testified that at the time she did not know the purpose for which they quit work, and that they had on other occasions left before quitting time for purposes foreign to the organization of a union. The Mitchell Independent's request for recognition was not granted. As stated, the Board exonerated petitioner for a violation of 8(1) and we are of the opinion there is no substantial evidence as to its violation of 8(2).

## The Order.

In view of what we have said, it follows that the Board's order must be modified in some particulars. There are also further controversies concerning the order which will be given consideration. In order to avoid confusion, we shall now refer to those paragraphs of the order which, in our judgment, must be eliminated or modified. Paragraphs not referred to are approved.

■■■ Section 1 contains the cease and desist portions of the order and Section 2, the provisions as to affirmative relief which the Board finds will effectuate the policies of the Act. Each section contains a number of paragraphs alphabetically designated. One (a) requires petitioner to cease and desist from refusing to bargain with Local 281, Amalgamated Clothing Workers of America, at its Michigan City, Indiana, plant, and 2(a) requires petitioner, upon request, to bargain with such Union. We have held heretofore the Board erred in finding that petitioner refused to bargain with Amalgamated. It follows, we think, that petitioner should not be ordered to cease and desist from doing that which it has not refused to do. In the absence of such refusal, it also follows that petitioner should not be required, upon request, to bargain with the Union who had a majority at a time so distant as that found by the Board. In view of altered circumstances which have likely occurred in the interim, such a requirement would not effectuate the policy of the Act. That is especially true in view of the representation made by another union, discussed heretofore, that it now represents a majority of the employees at this plant. One (a) and 2(a) should therefore be eliminated from the order.

■■■ One (b) requires petitioner to cease and desist from refusing to bargain with Local 239, United Garment Workers of America, as the representative of petitioner's employees at its Washington, Indiana plant. Two (b) requires petitioner, upon request, to bargain with this Union. As already stated, the proceedings with reference to this plant were severed from the instant proceedings and a consent decree entered by this court June 9, 1941. One (b) and 2(b) of the instant order were included in that decree. We see no reason to repeat them and think they should be eliminated.

One (d) has to do with the domination and interference of certain named inde-

pendent unions, being those discussed in connection with petitioner's various plants. We have sustained the Board's finding in this respect at all the plants involved, except Mitchell. The Mitchell Independent Employees' Association should therefore be eliminated from this paragraph.[3]

█ One (e) requires petitioner to cease and desist from giving effect to contracts and agreements with the Independent Unions named in 1(d). In connection with this paragraph, it is appropriate to consider (i) and (j) of Section 2. The former requires petitioner to withdraw all recognition of, and to disestablish, certain designated independent unions, and the latter to withhold all recognition from certain other designated independent unions. Petitioner contends that the Board has exceeded its power in ordering the disestablishment of independent unions not parties to the proceedings. This is especially true, so it is argued, in the instances where petitioner had recognized and entered into contracts with such unions as the bargaining agent. The Board relies for its authority upon N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, while petitioner relies upon Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. Undoubtedly, the holding of the court in the former case clearly sustains the Board's position. In the latter case it is true the court held a similar provision improper. It did not, however, overrule its pronouncement in the Greyhound Lines case. On page 233 of 305 U.S., on page 218 of 59 S.Ct., 83 L.Ed. 126, it distinguished it thus:

" * * * The Board had found upon evidence that the employer had created and fostered the labor organization in question and dominated its administration in violation of Section 8(2). * * *"

The distinction between the two cases is readily apparent. In the Greyhound Lines case the court held that the Board had power to disestablish an independent union where the company had been found guilty of an unfair labor practice by interference and domination, of such union. In the Edison case, the unfair labor practice found had no relation to the Independent Union and it was held that the Board was without power to disestablish it. In the instant matter, the Board has found, and we agree (except the Mitchell Independent) that pe-

titioner has been guilty of interfering and dominating the independent unions now ordered disestablished and recognition withdrawn. We think such provision is proper.

█ Petitioner contends that 2(c) requires the reinstatement of 15 persons who, at the time of the hearing, had been reinstated as found by the Board. The Board concedes this to be a valid objection and that these employees should be excepted from the provision without impairing their rights as to back pay during the periods they were discriminated against, as provided for in 2(f). This paragraph should be modified accordingly.

Two (d) requires petitioner, upon application, to place all persons listed in Appendix G and not yet reinstated, upon a preferential list, etc. We have heretofore, in our discussion concerning the Michigan City plant, held this provision in excess of the Board's authority. It will therefore be eliminated from the order.

█ Petitioner makes what we think is a valid criticism of 2(1). This paragraph has to do with the posting of notices informing employees that it will not engage in the unfair labor practices from which it is ordered to cease and desist. It is required that these notices be posted "in each and every one of the plants which petitioner now operates." As stated heretofore, the complaint originally involved charges of unfair labor practices at ten of petitioner's thirteen plants. The charges were dismissed by the Board for want of proof as to one (Loogootee, Indiana), and severed as to one (Washington, Indiana), leaving eight involved in the instant proceeding. Notwithstanding that there was no charge of unfair labor practices as to three of the plants, and that the charge was dismissed as to one, this order requires that notices be posted in all of them. In support of this provision, the Board argues that the unfair labor practices were system-wide, centrally directed and coordinated and, therefore, the order should apply to all plants. It cites in support of its position N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 438 61 S.Ct. 693, 85 L.Ed. 930. In our judgment, there is nothing in this case which supports the Board's position. On the other hand, in N.L.R.B. v. Ford Motor Co., 5 Cir., 119 F.2d 326, the court expressly held against the Board's contention in a

---

[3] It appears this modification is immaterial as this Independent Union went out of existence shortly after its creation.

similar situation. The court found the Board was without jurisdiction to make an order broader than the subject matter of the complaint. We agree with this conclusion. Furthermore, we think that petitioner, if it, at some future time, should be charged with an unfair labor practice at a plant or plants not included in the instant proceeding, would be entitled to a hearing before the Board, rather than this court in a contempt proceeding. This paragraph should be modified accordingly.

■ The notices contain the following clause: "* * * that the respondent's employees are free to become or remain members of either Amalgamated Clothing Workers of America, or United Garment Workers of America, or International Ladies' Garment Workers Union, and that the respondent will not discriminate against any employee because of membership or activity in any of those organizations;".

Petitioner contends that this clause is so limited as to interfere with the rights of its employees to join a union of their own choice. We think this is a valid criticism, and that following the union last named, there should be inserted—"or any other union of their choice."

The Board's petition for enforcement is allowed, conditioned upon the presentation of an order modified in accordance with this opinion.