NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BRODERICK WOOD PRODUCTS COM-
PANY and International Brotherhood
of Teamsters, Chauffeurs, Warehouse-
men & Helpers of America, Local No.
13, AFL–CIO, Respondents.

No. 5781.

United States Court of Appeals
Tenth Circuit.

Nov. 12, 1958.

Arnold Ordman, Washington, D. C. (Jerome D. Fenton, Thomas J. McDermott, Marcel Mallet-Prevost and William J. Avrutis, Washington, D. C., were with him on the brief), for petitioner.

Peter H. Holme, Jr., Denver, Colo. (Richard G. Wohlgenant and Holme, Roberts, More & Owen, Denver, Colo., were with him on the brief), for respondent, Broderick Wood Products Co.

Philip Hornbein, Jr., Denver, Colo. (Robert F. May, Denver, Colo., was with him on the brief), for respondent, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 13, AFL-CIO.

Before BRATTON, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

The National Labor Relations Board, pursuant to the provisions of the National Labor Relations Act, 29 U.S.C.A. § 160(e), petitions this court for enforcement of a Board order issued against respondents restraining them from certain labor practices and making them jointly and severally liable to employees for pay losses and for refund of union initiation fees and dues.[1]

Respondents were charged with violations of the Taft-Hartley Law and an N.L.R.B. trial examiner, after extensive hearings, ruled that respondent Broderick Wood Products Company[2] had engaged in unfair labor practices within the meaning of 29 U.S.C.A. § 158 (a) (1), (2) and (3) by executing, maintaining and enforcing contracts containing unlawful union-security agreements, by checking off union initiation fees thereunder, and discriminating with respect to hire and tenure of employees to encourage membership in respondent International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 13, AFL-CIO.[3] The examiner also found that respondent Teamsters had violated Section 158(b) (1) (A) and (2) of the Act by participating in the same unlawful union-security agreements, by causing the Company to discriminate against its employees and by restraining and coercing employees in the exercise of rights of self organization protected by Section 157 of the Act. The Board upon a review of the case affirmed the findings of fact and conclusions of law of the trial examiner and adopted his recommendations in issuing the order.

The detailed findings of the trial examiner may be summarized as follows:

Broderick Wood Products Company is a Colorado corporation with principal offices in Denver, Colorado, where it operates two plants for the production of telephone poles, fence posts and railroad ties. It processes these products by a system of pressure treatment for preservation against weather and insect attack and markets them primarily outside of Colorado.[4] The respondent Teamsters is a labor organization which admitted to membership the em-

1. The order, which was issued on June 6, 1957, is reported at 118 N.L.R.B. 38.

2. Hereafter called the Company.

3. Hereafter called Teamsters.

4. It is uncontested that it engages in interstate commerce within the meaning of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

ployees of Plant 1, and on February 15, 1947, entered into a collective bargaining agreement with the Company covering those employees. The agreement contained a union-security clause requiring all new employees of the Company to join the Teamsters within ten days after commencing employment and to maintain membership thereafter in good standing during the life of the contract. It further provided that preference "shall be given in hiring new employees to members of the Union who are capable, in the opinion of the Employer, to perform the work in the Employer's plant." This 1947 agreement was annually renewed without modification except as to pay rates which the Company recorded by notation on the original copy of the agreement.

The National Labor Relations Act was amended in 1947 by outlawing the ten-day and the preference provisions as to future agreements. However, respondents did not alter these provisions in their agreement when subsequently renewing it and neither of them apprised employees that the security clause of the contract was no longer effective.

In November 1955, the Company General Manager, Tait, suggested to Teamsters President, Salter, that a new formal instrument be drawn embodying the parties' current agreement. Salter agreed and proceeded to prepare the new contract. The instrument specified a one-year agreement with automatic renewals and was back-dated to February 15, 1955, the last renewal date of the 1947 agreement. The new contract retained the illegal preferential hiring provisions of the former contract. However, Salter, without consulting the Company in advance, modified the ten-day clause to allow new employees thirty-one days within which to join the Union thereby conforming to the statutory amendment in that regard.

On August 1, 1955, the Company leased the plant of a competitor, Western Wood Preserving, Inc., which adjoined the location of their own Plant 1, and hired substantially all of the working force Western had discharged when it discontinued operations a few days earlier. These employees were installed as the working force of No. 2 plant. One of the employees so hired was Casey Simpson, President of the United Mine Workers local which had been representing Western's employees under a bargaining contract. On several occasions during early August, Simpson and one McCreedy called upon the Company as UMW representatives and, citing the UMW contract, demanded recognition of UMW as the bargaining representative of the Plant 2 employees. This the Company refused to do.

When Teamster President Salter learned of the UMW effort he demanded in writing that the Company recognize the Teamsters as representing Plant 2 employees on the theory that Plant 2 employees were merely an accretion to the existing complement of Plant 1 employees and were therefore covered by the Teamsters' collective bargaining agreement.[5] Although the 1947 agreement containing the ten-day clause was still in effect at that time, Salter in the demand letter notified the Company that under the provisions of their agreement the Plant 2 employees were required to join the union within thirty days after beginning their employment. The Company acknowledged the Teamsters' position and distributed copies of the Teamsters' demand letter to the Plant 2 employees. The Teamsters thereafter obtained signed cards from virtually all of these employees authorizing the Company to deduct $30 from their wages as union initiation fees. The Company honored these cards and remitted $750 to the Teamsters.

In mid-November 1955, a petition was circulated among the Company em-

5. The Board found merit in this assertion.

## 552

ployees to initiate a Board election to decertify the Teamsters as the bargaining representative. Almost all of the personnel of both plants (64 in number) signed the petition and on December 2, Simpson filed it with the Board's Regional Office. Teamsters President Salter and Company Manager Tait each received copies of the petition on Monday, December 5.[6]

On December 2, the Teamsters delivered a written demand upon the Company that fifty-four named employees of both plants be forthwith discharged. Eight more names were added by a subsequent letter. This unprecedented demand was premised upon the contract provisions requiring union members to remain in good standing through payment of dues. The Union asserted each of the named employees to be delinquent in such payment.[7]

Oakford, assistant to the Company president, protested against Teamsters demanding the wholesale discharge of the men and prevailed upon Salter to give the employees twenty-four hours to settle up their dues. Salter agreed, and Monday morning, during working hours, the Company management read off the names on the Union list to the employees and told them that their employment was suspended, that they had twenty-four hours to put themselves in good standing with the Union, and that if they did not do so they would be discharged. The men were allowed to finish their shifts that day and were assured that if they "straightened out" with the Union their jobs would be open for their return.

The following morning, December 6, the Company went into emergency operation by using the few employees not named on the list for necessary maintenance work. That same morning substantially all of the suspended employees reported to the union hall. A number of them approached the cashier's window, presented their dues books and offered to pay their dues. The Teamsters office secretary who customarily handles dues, pursuant to instructions from Salter, informed them that she was unable to accept their dues until they had seen President Salter. This refusal to accept dues was rapidly communicated to the other employees in the hall. Thereupon the Plant 1 committeemen Frank Lewis and Mike Trujillo entered President Salter's office. Salter equivocated that he couldn't accept the dues but that he wouldn't refuse them. The ensuing conversation continued in a somewhat ambiguous vein with both sides reluctant to openly state their positions. The trial examiner concluded that Salter inferred there were other matters to straighten out before dues could be accepted and that, although Salter did not clarify what this "other business" was, clarification was unnecessary because the context of the conversation made it clear that Salter wanted the decertification petition withdrawn without having to openly state so, and that he asked that Simpson be called in because "he was quite prominent in this whole situation. * * *" Simpson, after entering the room, asked whether or not, if the decertification petition were withdrawn, the men could have a written

6. The trial examiner as affirmed by the Board expressly stated; "This finding, it may be noted, is limited solely to the actual receipt by Salter of the Board form and not to knowledge of the decertification activity."

7. The trial examiner noted in this connection that the dues of forty of the named employees had become due only at the close of business on December 1, the day before the list was delivered to the Company. He concluded that although

some twenty employees were two or three months behind in their dues, the inordinate haste with which the Teamsters took action, the fact that no notice was given the employees that dues delinquencies were jeopardizing their employment and the unprecedented departure from the previous and subsequent lenient policy in handling of dues collections all smacked of a purpose to crush the petition for decertification rather than dues collection.

guarantee that they would not be discharged. Salter stated they would not be discharged and that his word was sufficient. The committeemen said they would consult with the others and let him know the decision. The employees assembled and voted not to withdraw the decertification petition but did not inform Salter of their action. Some employees, in the presence of others, continued to offer their dues but, as before, they were refused.[8]

That afternoon the three committeemen, Simpson, Lewis and Trujillo, visited the Company offices and informed Company management that the men had tendered their dues to the Union and had been uniformly refused. Oakford, the Company assistant president, understandably concerned over the mounting effect on production through failure of the men to obtain Teamsters' clearance, telephoned President Salter. Salter assured him that dues were not being refused. Later, a large number of employees entered the Company office and unitedly informed the management that their dues were in fact being refused. They were informed that nothing could be done for them until they were "straightened out" with the Teamsters.

On December 7, Oakford asked Salter to refer some new employees to the Company. Salter sent five that day who were hired. On that same day, the Colorado State Employment Service was notified that workers were needed and on December 8 and 9 advertisements were placed in local newspapers.

Between December 7 and 9 the employees began to return to the Union office in small groups. Salter informed them that inasmuch as they had signed a decertification petition it would be in order for them to sign cards authorizing the Teamsters to represent them. The Union officers conducted interviews with small groups of the employees, directed the signing of representation cards and then, and only then, accepted dues and issued clearance slips to those individual employees who complied. Upon presentment of the clearance slips to the Company all but ten of the employees were reinstated to their former positions. The lapse of time and the filling of positions prevented reinstatement of those ten. By December 10, the Company was back in operation with a full crew, the great majority of whom were the former employees whose employment had been interrupted for several days because of the foregoing events.

Our factual review is limited by the provision of the National Labor Relations Act which reads: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C.A. § 160(e). In discussing the allowable scope of review the Supreme Court cautioned in N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, at pages 208 and 209, 60 S.Ct. 493, at page 495, 84 L.Ed. 704:

> "It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex administrative problems arising in the solution of industrial disputes. * * * Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act."

---

8. The trial examiner found that the proffer of dues was unconditional and that the employees who did not offer their dues were not required to go through the nugatory act because those ahead of them were uniformly refused.

 It is clear that we cannot disturb the findings merely because we might have drawn different inferences from some of the evidence. Utah Copper Co. v. N. L. R. B., 10 Cir., 139 F.2d 788. Respondents have attacked some of the findings of the Board. A review of the record persuades us that there is substantial evidence to support the Board's findings and consequently we must not disturb them.

The portions of the National Labor Relations Act which are material to the instant charge of unfair labor practice read as follows:

29 U.S.C.A. § 157. "Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

29 U.S.C.A. § 158. "Unfair labor practices.

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organiza-

tion: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, * * * : *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) * * * (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

* * * * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * * *"

■ Respondents each attack the Board decision by contention that the contract did not in fact contain illegal provisions and that therefore their actions could not have been unfair labor practices within the meaning of the Act. The contract clause in controversy provides:

"Union Security: All present employees who are now members, and those employees who may become members of the Union, shall be and remain members of the Union during the life of this contract. All new employees hired after the execution of this Agreement, shall become members of the Union within thirty-one (31) days after their first date of employment by the Employer, and maintain their membership in the Union in good standing during the life of this contract. Preference shall be given, in hiring new employees to members of the Union who are capable, in the opinion of the Employer, to perform the work in the Employer's plant.

"Good Standing: Good standing, for the purpose of this Agreement, shall be defined as the payment of uniform initiation fees and periodic dues as required for acquiring or retaining membership. Whenever the Union makes requests upon the employer to discharge any employee for failure to maintain membership in the Union in good standing, such requests shall be made in writing."

Respondents insist that the preferential hiring clause (the last sentence of the first quoted paragraph) was included in the written instrument only by inadvertence, that it was never part of the agreement of the parties, and that we must regard it as a dead letter which is severable from the other contract terms leaving the remainder of the contract valid and proper.

The trial examiner, contrary to respondents' contention and in spite of the evidence they introduced to support their view, expressly found that " * * this is not a situation where an inaccurate clause lurked unnoticed in a collective bargaining agreement." As we have pointed out, such a finding when adopted by the Board is binding on this court if supported by substantial evidence. The evidence demonstrates that when the parties entered into the November 1955 contract they altered the terms of the union-security clause from that of the 1947 agreement by allowing thirty-one days for employees to join the union rather than the previous ten-day provision and added a definition of "good standing" immediately following the preferential hiring provision. Such attention to the terms of the clause is not consistent with a claim that the sentence of the clause which is immediately between these two changes was included only by oversight. Furthermore, shortly after the 1955 contract was executed legal counsel for the Teamsters pointed out to President Salter that the preferential hiring clause was illegal. (He nevertheless chose to leave it unaltered.) Also, Oakford assistant to the Company president, testified that in the spring of 1955 he was aware that the contract still contained the preferential hiring clause (although he viewed it as inoperative because of another clause we will discuss hereafter). Under the circumstances, we accept the conclusion of the Board that the clause did not creep into the contract by mere oversight.

■ In this same connection, respondents insist that the illegal preferential hiring language contained in the union-security clause is severable from the rest of the contract and that as such it should be lifted out and separately condemned, leaving as valid the other union-security provisions and the action taken thereunder. To sustain this position, they assert that the preferential hiring clause was never utilized by either party and cite N. L. R. B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832, as requiring severance under such circumstances.

In that case, the employer discharged an employee who had in the course of his employment refused to cross picket lines of a union with which he had no affiliation and which had no grievance against his employer. His own union had not prompted him to act in sympathy with the other union and his co-employees crossed the lines without objection. The N. L. R. B. upon a charge of unfair labor practice ordered the employee reinstated. The Court of Appeals, 2 Cir., 197 F.2d 111, set aside that order and upon appeal to the Supreme Court, the employer argued that his action was justified because the employee's refusal to cross picket lines violated the terms of an arbitration contract executed by him and the employee's union. This contract provided against " * *. * cessation of work or interference therewith except as against a party failing to comply with a decision, award or order of the Adjustment Board." The N. L. R. B. conceded that if the arbitration agreement were valid, it would be a complete defense to the order, but urged that the contract contained a union-security clause which, although not involved in the discharge of the employee, invalidated the entire contract because it did not comply with Section 9(e) of the Act. The Supreme Court rejected this argument and construed the entire union-security clause as severable from the other contract terms. The court pointed out that the illegal provision had in no way affected the employment of the complaining employee nor the conduct of any party relevant to the decision, that the objectionable clause was separated from the other contract terms in the contract itself, and that the contract contained savings and separability clauses which were effective in severing the illegal clause from the otherwise valid contract.

We deem Rockaway News to be clearly distinguishable from the instant case and, therefore, not controlling. Here, the Board found that the very "execution and maintaining" in effect of the illegal clause was itself an unfair labor practice. No such issue was presented by Rockaway News. The court did not purport to pass upon severability as a defense for "executing and maintaining" an unlawful union-security clause. In that case, the discharge of the employee was in no way connected with or affected by the illegal security clause. Here, the union-security clause was the very basis for the charge of unfair labor practices. It was the union-security clause that Teamsters were enforcing when demanding that the employees be discharged. Moreover, in Rockaway News, the clause considered severable was a complete and separate portion of the contract. Here, the preferential hiring provision which respondents insist must be severed from the contract is a sentence contained within the union-security clause itself. To lift out one portion of the union-security clause while at the same time giving effect to the remainder of the paragraph would be but to corrupt the purport of Rockaway News.

What respondents seek, in effect, is to be allowed to insert an illegal clause into their contract, and then, after having received the benefits that flow naturally from such a clause, avoid liability under the Act by asserting that they never actively exercised the rights provided by the clause. We cannot favor such a view. It is settled law that the mere execution of an illegal security clause without more is a violation of the Act sufficient to warrant Board action. As stated in Red Star Exp. Lines of Auburn v. N. L. R. B., 2 Cir., 196 F.2d 78, at page 81:

"The execution of a contract containing a forbidden union-security clause constitutes an unfair labor practice. This is so because the existence of such an agreement without more tends to encourage membership in a labor organization. The individual employee is forced to risk discharge if he defies the contract by refusing to become a member of the union. It is no answer to say that the Act gives

him a remedy in the event that he is discharged. The Act requires that the employee shall have freedom of choice, and any form of interference with that choice is forbidden."

And in N. L. R. B. v. E. F. Shuck Construction Co., 9 Cir., 243 F.2d 519, at page 521, the court stated, concerning another illegal union-security clause:

"The mere retention of such a clause in a contract in force between the parties is a continuing unfair labor practice even where there is no attempt to enforce it because so long as it remains a part of the contract it 'tends to encourage membership in a labor organization' in violation of Section 8(a) (3)."

See also N. L. R. B. v. Gottfried Baking Co., 2 Cir., 210 F.2d 772.

■ The respondents tacitly admit that their contract, in form, contains an illegal provision within the meaning of Section 158(a) (3) and yet to avoid liability they assert that they did not intend the preferential hiring provision to be part of their agreement and that this is proven as fact because they never actually utilized its terms. If we were to allow parties who have received the natural benefits from executing such a provision to avoid liability by such an assertion, it would undermine the very purpose of that section. The basic purpose of Section 158(a) (3) is to prevent employers from encouraging or discouraging membership in any labor organization by discrimination in regard to hire or tenure. The mere execution and maintaining within a collective bargaining contract of a preferential hiring provision violates that section. Respondents never amended or disavowed that clause nor did they inform the employees that it was not part of their agreement. We must under the circumstances construe it as an integral part of the union-security arrangement and a discriminatory labor practice within the meaning of Section 158(a) (3).

As a corollary to their argument that the preferential hiring clause is severable the respondents declare that the clause is made null and void by force of a savings clause which appears in both the 1947 and the 1955 contracts. That clause reads:

"Government Intervention: In the event a Federal or State Government passes a law, during the life of this agreement, providing for any condition contrary to the terms of this agreement, it is mutually understood and agreed that said law shall supersede any condition or provision as set forth herein."

■ The argument has only initial appeal. To be effective in nullifying questionable clauses in the contract the savings clause must specifically defer application of the questionable clause until it is determined to be legal. As stated in N. L. R. B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, at pages 723 and 724, affirmed Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455:

"* * * an employee cannot be expected to predict the validity or invalidity of particular clauses in the contract, and will feel compelled to join the union where a union-security clause of questionable validity exists, if only as a hedging device against a possible future unholding of the clause. *Only a specific provision deferring application of the union-security clause will immunize the contract against this illegality.*" (Emphasis added.)

See also Red Star Exp. Lines of Auburn v. N. L. R. B., supra, and N. L. R. B. v. E. F. Shuck Construction Co., supra. Furthermore, by its own terms, the savings clause could affect only clauses made illegal by *laws passed during the life of the agreement* and the portion of the Act which outlaws the preferential hiring provision was already in effect

prior to the extensions of the 1947 contract and the execution of the 1955 agreement. The mere execution of an illegal clause in a collective bargaining contract without any showing that its terms were enforced is itself an unfair labor practice within the Act. The savings clause does not avoid that rule.

■ Respondents also were found to have committed an unfair labor practice by the discharge or suspensions of the sixty employee complainants. Since this action was demanded by the Teamsters and performed by the Company under the purported authority of an invalid union-security clause it follows that the Board finding must be sustained. Further, the evidence not only supports but compels the finding of the Board that the Teamsters demanded the discharge of the employees as an instrument to undermine the decertification petition rather than a bona fide effort to maintain union financial stability. When a union-security clause is invoked for any reason other than collection of proper fees and dues [9] it constitutes an unfair labor practice. Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., supra; N. L. R. B. v. Local 169, Industrial Division, International Brotherhood of Teamsters, etc., 3 Cir., 228 F.2d 425; N. L. R. B. v. International Ass'n of Machinists, Local No. 504, 9 Cir., 203 F.2d 173.

■ In supplement to the attack on the substantive findings of the Board, the respondents challenge the validity of its order. The Company urges that the reimbursement to employees of union dues and initiation fees in which the Company has never had an interest is penal and beyond the Board's power. In support of this contention, respondent Company cites a number of cases [10] in which courts of appeals have refused to enforce orders of the Board which required reimbursement of checked-off dues. The Company points out that subsequent to the decision of those cases the United States Supreme Court met the same problem in Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568, where it ruled contrary to that position. However, it is urged that the Supreme Court carefully restricted its opinion to the particular facts before it and expressly avoided passing on the cases they cite and that, therefore, the case is not controlling here. We do not agree with this conclusion. It is true that in Virginia Electric the court avoided passing on the validity of the decisions cited by the Company, but those cases were not on appeal before it. The stated reason for granting certiorari in Virginia Electric was because of the apparent conflict in the decisions of the courts of appeals [11] concerning the authority of the Board to require reimbursement of checked-off dues. We must accept the opinion, therefore, as intended to clarify that question. The case makes it clear that the Board has wide discretion

9. The Board also found that the Company did not act in good faith in discharging the employees because the Company "was on constructive notice that something was strongly amiss in this dues collection effort." If the Board ruling was intended to or tends to hold that an employer must, at his peril, explore the motive of a union in its demands made under the circumstance of this case we reject such ruling.

10. Western Union Telegraph Co. v. N. L. R. B., 2 Cir., 113 F.2d 992; Corning Glass Works v. N. L. R. B., 2 Cir., 118 F.2d 625; N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 116 F.2d 816; N. L. R. B. v. Gerity Whitaker Co., 6 Cir., 137 F.2d 198; N. L. R. B. v. United States Truck Co., 6 Cir., 124 F.2d 887; A. E. Staley Mfg. Co. v. N. L. R. B., 7 Cir., 117 F.2d 868; N. L. R. B. v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984; Reliance Mfg. Co. v. N. L. R. B., 7 Cir., 125 F.2d 311; Kansas City Power & Light Co. v. N. L. R. B., 8 Cir., 111 F.2d 340; N. L. R. B. v. Southwestern Greyhound Lines, Inc., 8 Cir., 126 F.2d 883; N. L. R. B. v. Continental Oil Co., 10 Cir., 121 F.2d 120.

11. The court in stating this reason for granting certiorari expressly referred by footnote to the eleven cases which the Company relies on, supra footnote 10.

in ordering affirmative action against persons found engaging in unfair labor practices, that the particular means for expunging the effects of unfair labor practices are for the Board and not the courts to determine, that the Board *does* have the power to order reimbursement by the employer, and that when it so orders, its decision should stand unless there is a showing that the order is a patent attempt to achieve ends not designed, to fairly effectuate the policies of the Act. See also N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377. Those same principles must be applied here. Furthermore, the courts have repeatedly held that the Board may impose joint and several liability on both the employer and union for reimbursement of fees and dues when each participated in the discriminatory activity. N. L. R. B. v. Newspaper & Mail Deliverers' Union, 2 Cir., 192 F.2d 654; Union Starch & Refining Co. v. N. L. R. B., 7 Cir., 186 F.2d 1008, 27 A.L.R.2d 629; N. L. R. B. v. Pinkerton's Nat. Detective Agency, 9 Cir., 202 F.2d 230; N. L. R. B. v. Waterfront Employers of Washington, 9 Cir., 211 F.2d 946.

■ The Teamsters attack the order by urging that since they were not charged with wrongfully receiving dues and initiation fees the reimbursement order cannot stand. An examination of the complaint reveals that it duly alleged unfair labor practices in making, maintaining and enforcing the unlawful union-security agreement which made membership in the union and hence dues payments a condition of employment. The respondents were fully apprised of the matters in issue and they were all litigated. We see no reason why the receipt of the sums should have been alleged as a separate unfair labor practice as a prerequisite to issuance of the order. The reimbursement order is calculated to remove the effects of the unfair labor practices by making restitution to employees and is therefore properly adapted to a situation which calls for redress. Virginia Electric & Power Co. v. N. L. R. B., supra; N. L. R. B. v. Local 404, International Brotherhood of Teamsters, etc., 1 Cir., 205 F.2d 99. Teamsters continue by asserting that the requirement that the Company withdraw recognition of Teamsters as the collective bargaining representative of the employees is not justified because it goes too far. This, again, is a matter primarily within the discretion of the Board and, absent a showing of clear abuse, will not be disturbed on review.

Finally the respondent Company advances the argument that this action must be dismissed because the N.L.R.B. had publicly granted "amnesty" to other violators of the Taft-Hartley Act and has declared a moratorium on enforcement of the law against unlawful hiring practices. The urge that enforcement against them under the circumstances would be discriminatory and repugnant to principles of equity. It is true that in February 1958, prompted by a concern with the prevalence of illegal hiring arrangements in the building and construction industry, the General Counsel for the Board publicized a letter to that industry which pointed out that voluntary correction of such illegal agreements would be in the public interest and the preferable solution to the problem. He then suggested that employers and unions vigorously undertake to correct such arrangements during the period from March 1 to June 1, 1958, and stated that if this were done it "may" warrant disposition without full application of the reimbursement remedy. However, as we read the letter of the General Counsel, he made it clear by the terms in the letter itself that the remedy would only be withdrawn for voluntary correction in two situations: future cases brought before the Board and those then pending disposition. This would expressly exclude the application of the "moratorium" in the instant case because the Board's decision and order issued on June 6, 1957, some eight months before the writing of the General Counsel letter. Thus there was, as to the Company, no charge pending

before the Board. Moreover, the Board's order was in large part based upon violations during the latter half of 1955 and the first month of 1956. These violations could not be expunged by voluntary correction of the illegal agreement in 1958.

 The rule is well settled that even " * * * a change in the policy of the Board does not require its application to the disposition of cases theretofore decided by it and cannot be availed of by a respondent against whom an order has been entered prior to the adoption of such policy." N. L. R. B. v. Armco Drainage & Metal Products, Inc., 6 Cir., 220 F.2d 573, at page 584, certiorari denied 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748; N. L. R. B. v. Kartarik, Inc., 8 Cir., 227 F.2d 190.

The petition for enforcement is granted.