**NATIONAL LABOR RELATIONS BOARD**
**v. STONE et al.**

No. 7863.

Circuit Court of Appeals, Seventh Circuit.

Feb. 17, 1942.

Rehearing Denied March 9, 1942.

Robert W. Watts and Wm. F. Guffey, Jr., both of Washington, D. C., I. S. Dorfman, of Chicago, Ill. and Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross and Gerhard P. Van Arkel, Asst. Gen. Counsels; Leonard Appel and Robert C.

Moore, all of Washington, D. C., for National Labor Relations Board.

Lewis F. Jacobson, David Silbert, and Robert B. Shapiro, all of Chicago, Ill., for respondent.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition of the N. L. R. B. for enforcement of its cease and desist order directed to respondents, issued July 31, 1941, pursuant to Section 10(c) of the National Labor Relations Act, 29 U.S.C.A., § 151 et seq. The complaint was issued upon charges preferred by International Printing Pressmen and Assistants' Union, Box and Carton Local No. 415, affiliated with the American Federation of Labor. The usual proceedings were had which culminated in the order and decision here sought to be enforced.

Respondents are engaged in the manufacture and sale of corrugated shipping containers at their plant in Chicago, Illinois. No question is raised as to the Board's jurisdiction. The sole charge, sustained by the Board, was that respondents interfered with, restrained and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act, thereby violating Sec. 8(1) of the Act.

Respondents contend that the Board's findings of fact are not supported by substantial evidence and that its order is invalid and improper. Except as to some relatively minor matters, there is little, if any, conflict as to the facts. The Board's decision is therefore predicated largely upon inferences and conclusions, some of which are legal rather than factual, which it draws from, and places upon, certain acts of the respondents.

The controversy revolves largely around (1) a speech made by respondents' attorney, Jacobson, on August 5, 1939, to the employees who were assembled in the plant for such purpose, (2) the distribution by respondents and the execution of individual employment contracts with their employees for the year 1939, renewed for the year 1940, and again renewed for the year 1941, (3) an interview by respondents' attorney with all of respondents' employees on March 15, 1940, while there was pending before the Board a representation proceeding, and (4) a letter mailed by respondents to all of their employees on May 3, 1939.

In the beginning we note the stress which respondents place upon their background for fair dealing with their employees, union and non-union alike. It is pointed out that the employees were at no time restrained from a free discussion of their union activities and that no employee was discriminated against, laid off or discharged because of union activity or membership. Undoubtedly, such a situation is commendable and entitled to consideration in cases of some character, just as it is given consideration when the employer's background is shown to be hostile to the union. In a situation such as here presented, however, the background is of minor importance for the reason that the matters in controversy are dependent largely upon a construction of speeches, interviews and written documents.

In April, 1939, the Union, through its organizer, Hetzer, initiated a membership campaign among respondents' employees. On August 4, Hetzer met with one Shaeffer, whom the Board found was an attorney for respondents, for the purpose of securing respondents' recognition of the Union as the exclusive bargaining agent for the employees. Hetzer produced signed membership application cards which Shaeffer, upon inspection, admitted substantiated the Union's claim to a majority status. Hetzer also submitted a proposed contract which Shaeffer stated he would place before respondents along with the question of Union recognition. Hetzer was invited to return on August 7 for respondents' decision. Hetzer complied with this suggestion and, on August 7, was told by Shaeffer "Everything was off * * * he wouldn't have anything further to do with us."

Respondents urge that no importance can be attached to the conversation between Hetzer and Shaeffer for the reason that the latter was without authority to represent respondents in this particular matter. As we understand, he had been an attorney for respondents and we find nothing in the record disclosing a termination of such relation. It is true that the law firm of which Jacobson was a member, was employed prior to August 4, in connection with respondents' labor relations. It is also pointed out that Shaeffer merely counted the alleged membership cards in the possession of Hetzer and that the names of the signers thereof were not checked for the purpose of ascertaining

their authenticity. A serious question would be presented in this respect had the Board found upon this incident a refusal on the part of respondents to recognize the Union as a bargaining agent. No such charge was contained in the complaint, however, and, of course, the Board does not rely upon the incident for such purpose. We think, however, it may be plainly inferred that respondents, through the Shaeffer incident, had notice that the Union was claiming a majority, and that such incident is material in connection with the activities of the following day (August 5).

On this latter date, the employees were assembled in the plant for the purpose of hearing an address by respondents' attorney, Jacobson. No verbatim report of this speech was introduced in evidence, but a number of witnesses testified from memory as to what was said. Such testimony is not in conflict, except as to minor matters. The Labor Act was read and explained and we think it must be said that the employees, in a general way, were given a rather accurate statement as to their rights under the Act. It also contained a forcible argument against Unions. In support of such argument, statistics were cited reflecting the number of lost work hours attributable to strikes called by the Union. At this meeting ballots were distributed to the assembled workers, but just what was voted upon is a matter of dispute. Respondents contend that the only question submitted had to do with the selection of "monitors," but in addition, the Board found there was further submitted the question as to whether the employees were willing to work the year around for the same pay, without striking. Clearly, we think, there is no substantial evidence to sustain this finding. Of all the witnesses who testified, only the witness Kulps pretended to suggest anything concerning strikes. A reading of his testimony discloses that he didn't know what he was talking about. He made no positive statement which would support the Board's finding, and admitted: "I don't know just what it was because it was so long ago, I don't remember." There is also a dispute as to the purpose in selecting "monitors." Respondents contend that they were solely for the purpose of arranging vacation schedules, but, in addition, the Board found that the purpose was to "create grievance machinery in place of that proposed by the Union." While there is some doubt concerning the validity of this finding, we think it is substantially supported. The Board also attaches importance to statements made in the speech to the effect that wages were to be increased and vacations given with pay.

On August 7, or August 8, respondents' superintendent caused foremen and other employees to distribute identical blank individual contracts to all employees, which were accepted by 107 of the 152 persons then employed. This contract was, by its terms, effective until December 31, 1939, with the privilege of renewal upon terms satisfactory to the employee. The purpose of the contract is stated thus: "To promote steady employment at the highest and fairest wages, to maintain harmony and to prevent strikes and labor troubles for the worker or management, it is agreed:" Then follows provisions with reference to steady employment, wages, with provisions for increases thereof under certain designated circumstances, bonuses and vacations, hours and overtime, and preference and seniority. Also included is a clause entitled "Adjustments" which furnishes the chief controversy insofar as the contract is concerned. It provides: "The Company will endeavor to adjust with the Employee all complaints and disputes by negotiation, if possible. If it cannot be so adjusted, the Employee hereby selects ...... as his representative and arbitrator, and the Company selects its superintendent as its representative, and they shall promptly hear and adjust all such complaints, or failing to do so shall elect a third disinterested arbitrator, which three shall promptly hear, adjust and arbitrate every such complaint or dispute. The decision of a majority of such Board to be final on both Employee and Employer."

The Board found that "the circumstances under which the contracts were submitted were in themselves coercive." The only testimony to which our attention is called, in support of this finding, is that of one witness that he signed a contract only after he had been requested on two or three occasions to do so by his foreman. Another witness testified that one of respondents' attorneys, in the fall of 1939, stated that the individual contracts had supplanted the membership application cards of the Union.

In the latter part of September, 1939, respondents submitted by mail to all em-

ployees copies of individual employment contracts for 1940, substantially in the same form as those used in 1939. Such contracts were signed by 144 of the 163 employees. Again in January, 1941, similar contracts were distributed for that year. They were signed by 45 of the 201 employees.

On or about March 15, 1940, respondents' attorneys interviewed all the employees. At this time there was pending before the Board a representation proceeding. The purpose of such interviews, as claimed by respondents, was to ascertain certain facts in preparation for the Board's representation hearing. Here again the employees were told of their rights under the Act and were asked whether they had signed contracts, whether they belonged to the Union, and, if so, would they want the Union to represent them. The reason assigned at the hearing for the inquiry about the contracts was that respondents had misplaced some of them and thus did not have a complete list of those who had signed. The answers to the questions were reduced to writing, and the employees requested to sign, provided it was agreeable to them to do so.

Following the hearing on the representation petition, the Board scheduled an election for May 8, 1940. On April 24, 1940, and May 1, 1940, the Union sent letters to all of respondents' employees. We do not believe it is important to relate the contents of these letters. It is sufficient to say that they contained a rather scathing indictment of respondents' anti-union attitude and their efforts to destroy the Union. That they went far beyond the bounds of truth and accuracy in describing respondents' attitude toward the Union, so far as this record discloses, can not be disputed.

On May 3, 1940, the respondents, ostensibly, in reply to the charges made against them by the Union, wrote a letter to each of their employees. This was only a few days before the date of the election for the purpose of selecting a bargaining agent. Again we think it must be said that the employees were fairly apprised of their legal rights. The letter proceeds at length, however, with a powerful argument against Unions and their impotency to be of any help to the employees. Included in the letter was this question: "We feel that you are better able to adjust whatever grievances you may have directly with the company. Why pay an outsider to attempt to do this for you?" After reciting the benefits which the employees had derived from individual contracts, this question was propounded: "Do all of these things indicate that your contracts with the company mean nothing? Do you believe that a outside organizer can get you more than this?"

The Board found that Jacobson's speech of August 5 was an interference with, restraint and coercion of, the rights guaranteed by Section 7 of the Act; that the adjustment clause in the individual contracts was, in itself, a violation; that the interviewing of the employees on March 15, 1940, was another step in the respondents' program to perpetuate a system of individual contracts and to interfere with the exercise of rights guaranteed by Section 7, and that the purpose in mailing the letter of May 3, 1940, was also to interfere, restrain, coerce and influence the employees against the Union in the Board election soon to follow. After making these specific findings of unfair labor practices, the Board made a general finding predicated upon the events as a whole, as follows: "The Board therefore finds, as did the Trial Examiner, that by the speech made by Jacobson to the employees at the plant meeting of August 5, 1939, and the proceedings at said meeting; by causing their employees to sign individual contracts in 1939, 1940 and 1941; by questioning their employees concerning their union affiliation in March 1940; and by sending to their employees the letter of May 3, 1940, the respondents have interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act."

Respondents make a rather plausible argument that the speech of August 5, 1939, the questioning of their employees, and the letter of May 3, 1940, are protected by the constitutional right of free speech. Reliance is placed upon the recent decision of N. L. R. B. v. Virginia Electric & Power Company, 62 S.Ct. 344, 86 L.Ed. ——, decided by the Supreme Court, December 22, 1941, which apparently supports such argument. We do not think it is necessary, however, to discuss or decide the validity of the Board's conclusion with reference to these separate incidents, because of the Board's general finding predicated upon the events as a whole. In such a situation, the rationale of the Virginia Electric & Power Company case, as we understand it, has no application. In other

words, the Board, in the instant matter, predicated its findings upon the whole course of conduct which it failed to do in that case, and which was the reason assigned for reversal.

We are of the view that the events, as a whole, sustain the Board's conclusion. The rapidity with which one event followed another, the manner in which they were timed with reference to each other, as well as the numerous covert suggestions, in themselves, lend persuasive support to the Board's conclusion. A statement of the events in chronological order bears out this statement: August 4, 1939, Hetzer, the Union organizer, made his demand upon Shaeffer for Union recognition; August 5 the employees were assembled for the speech by Jacobson; August 7 Hetzer was advised by Shaeffer that he was through with the Union; on the following day, respondents' superintendent directed the preparation of the 1939 contracts which were immediately distributed to the employees; March 15, 1940, the employees were interviewed by respondents' attorneys pending the representation proceeding before the Board, and on May 3, 1940, five days before the Board election, a letter was dispatched to each of the employees. It may be that the time of some of these happenings was merely coincidental, but it is not reasonable to think that they all occurred as they did except as a part of a plan to interfere with the rights of the employees as provided in Section 7 of the Act. The interview with the employees on March 15, 1940, was particularly inexcusable. At that time there was pending before the Board a representation proceeding with a view of determining whether an election should be called. We do not see how the information obtained at this inquiry was any concern to respondents. As to whether an election should be called was a matter entirely within the province of the Board. Again, we think the letter of May 3, 1940, was, to say the least, ill-advised. Of course, we assume that when respondents were assailed, as they were by the Union letters, they naturally felt an urge to reply. The campaign then being conducted, however, was not one between the Union and respondents. It was a contest toward which they should have maintained a strictly neutral attitude. The letter, even though it contained no misrepresentations, was calculated to influence and, we think, interfere with the rights of the employees to have a free election.

Furthermore, we agree with the Board that the so-called adjustment provision, contained in the contracts, constitutes a violation of the Act per se. We so held in N. L. R. B. v. Superior Tanning Co., 7 Cir., 117 F.2d 881, 890, and we see no reason to recede from that holding. It is argued that what was said in that case concerning this clause is dictum. We do not think so. The provision was directly involved and found to be illegal. Nor do we think this provision can be legalized by showing the contract was entered into without coercion and that the employees understood they were not being deprived of their rights under the Act. One of the purposes, as stated in the contract, is "to prevent strikes and labor troubles." By the clause in dispute, the employee bound himself to negotiate any differences with the employer and to submit such differences to arbitration. The result of this arbitration was final. Thus the employee was obligated to bargain individually and, in case of failure, was bound by the result of arbitration. This is the very antithesis of collective bargaining. By this provision the employee not only waived his right to collective bargaining but his right to strike or otherwise protest on the failure to obtain redress through arbitration. It is pointed out by respondents that this is a form of arbitration clause often found in contracts between a Union and an employer. We assume, however, that under such circumstances, the arbitration clause is the result of an agreement reached with the duly selected bargaining agent of the employees. Such action is in conformity with the Act, but must be distinguished from the instant case where the clause was agreed to as a result of individual action and thereafter imposed a restraint upon collective action.

It is also contended by respondents that the Board was precluded by the doctrine of res judicata from entering its order in the instant case. The adjudication relied upon was in connection with the representation proceeding and the objections made by the Union to the election. While we think it is unfortunate that there was such a long delay in the issuance of the complaint, and especially in the fact that the Union did not charge unfair labor practices until after it had participated in the

election, and lost, yet we are of the view there is no merit in the contention that the issues involved here had formerly been adjudicated. The representation proceedings were under Section 9 of the Act, while the instant proceedings are under Section 8(1). The issues were different, as well as the parties.

■ Respondents object to certain provisions of the Board's order. Paragraph 1 (b) prohibits "any modification, continuance, extension or renewal thereof, or to any similar form of contract for any period subsequently to the date of this decision." It is particularly objected that the words "any similar contract" are so indefinite and uncertain that respondents would continually be in doubt as to their right to enter into any kind of an individual employment contract. This objection, to the same provision, was made and overruled in N. L. R. B. v. Superior Tanning Co., 7 Cir., 117 F.2d 881, 892. In approving this provision, however, we do so on the assumption that the language "any similar contract" refers to a contract containing an adjustment clause of the same effect as that contained in the contracts in the instant case.

■ Objection is also made as to Paragraph 1(c) which we think must be sustained. It enjoins respondents "in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection as guaranteed in Section 7 of the National Labor Relations Act." This is a blanket provision which may include numerous unfair labor practices wholly unrelated to that charged and found in the instant case. We think it comes clearly within the prohibition announced in N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930. See, also, N. L. R. B. v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540.

■ The order is directed at respondents "their agents, successors and assigns." By reason of our decision in N. L. R. B. v. Bachelder, 125 F.2d 387, filed February 4, 1942, the words "successors and assigns" should be eliminated.

The order will be modified as suggested, and as so modified, enforcement is allowed.