**NATIONAL LABOR RELATIONS BOARD
v. SUNBEAM ELECTRIC MFG. CO.**

**No. 8110.**

Circuit Court of Appeals, Seventh Circuit.

Feb. 6, 1943.

Rehearing Denied March 27, 1943.

John P. Jennings, Robert B. Watts, General Counsel, Ernest A. Gross, Associate General Counsel, Howard Lichtenstein, Asst. General Counsel, Louis Libbin, and Eugene J. Davidson, Attorneys, National Labor Relations Board, all of Washington, D. C., for petitioner.

Isidor Kahn, Robert D. Markel, and Wm. F. Little, all of Evansville, Ind., for respondent.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

This is a petition by the National Labor Relations Board, hereinafter called the Board, for the enforcement of its order against the Sunbeam Electric Manufacturing Company, hereinafter called the company. The company was found guilty of unfair labor practices in that it had, in violation of Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), interfered with, restrained and coerced its employees in the rights granted them under Section 7, 29 U.S.C.A. § 157. The order directs the company, its officers, agents, successors and assigns to cease and desist from in any manner interfering with, restraining or coercing its employees in the exercise of their rights under Section 7 of the Act, and orders the company to distribute notices to all of its employees stating that it will not engage in the conduct from which it was ordered to cease and desist, and to post the usual notices.

Questions are presented on the validity and the sufficiency of the complaint, the sufficiency of the evidence to sustain the Board's findings, and the form and content of the order. We shall consider them in this order.

The company challenged, at its first opportunity, the validity of the complaint, which was signed by the Regional Director. The company contends that by the rules of the Board, the complaint should have been signed either by the Executive Secretary of the Board or by the Director of the Field Division of the Board, as required by Article VI, Section 2, of the Rules and Regulations of the Board; and that the Board had not delegated to the Regional Director the right to sign complaints.

Article I, Section 4 of the Rules provides that the Regional Director shall be the Board's agent in a particular region. Article II provides for the filing of charges of unfair labor practices. Section 2 thereof provides that such charges shall be filed with the Regional Director for the region in which the alleged unfair labor practice took place, except as provided in Section 36 of the same article. Article IV, Section 1, provides that, "All Regional Directors now or hereafter in the employ of the Board are herewith designated by the Board as its agents: * * * (c) To issue and cause to be served complaints, * * *".

Thus it will be seen that all charges upon which complaints shall issue shall be filed with the Regional Director, who shall issue and cause to be served the complaint, except those charges filed pursuant to Section 36 of Article II. Section 36 provides exceptional circumstances under which the charges may be filed with the Board in Washington, and, in that event, the provisions of Sections 3 to 31, inclusive, of Article II shall apply, as far as applicable, and, "* * * the powers granted to Regional Directors in such provisions shall, for the purpose of this section, be reserved to and exercised by the Board." It is as to these charges, that the Board permits to be filed and controlled in the Washington office, that Section 2 of Article VI applies. This Section provides: "The Executive Secretary of the Board, or in the event of his absence or disability, the Director of the Field Division of the Board, is hereby authorized to sign all orders of the Board, and sign and issue *all complaints authorized to be issued by the Board.*" (Italics ours.) Obviously, this means all complaints issued from Washington under Article II, Section 36 of the Rules. It is there the offices of the Executive Secretary and the Director of the Field Division of the Board are located.

We therefore hold that all complaints filed in the Regional Office may be properly signed by the Regional Director, who is the agent of the Board in his region to issue and serve the complaints. The Rules contemplate that when a complaint is issued it shall be signed, and when the Board made the Regional Director its agent to issue, it made him its agent to sign.

The company next urges that the complaint does not allege a violation of Section 8(1) of the Act, but only that the company has engaged "in a preconceived and continuous plan and course of action for the purpose of interfering with the self-organization of its employees * * *." In its brief the company says: "Reading the complaint in its entirety, it is quite obvious that the Board intended to charge the respondent, Sunbeam Electric Manufacturing Co., with violations of Section 8(1) of the Act rather than a violation of any of the other provisions of the National Labor Relations Act."

■■■ If it is "quite obvious" to the company what the Board intended to charge, then it was sufficient to advise the company what the proceedings were about, and what the company would have to meet on the hearing. The National Labor Relations Act does not contemplate or require pleadings to meet the exacting standards of a court of law. Neither the accuracy nor the form of such pleadings is required. All that is required of the complaint in such proceedings is that it shall state facts which shall enable the respondent to understand the offense which it is alleged the respondent has committed under the Act, and to understand the issue it will be required to meet. For the company to participate in the extensive hearings in this proceeding before the Board and to admit in its brief here that it is perfectly obvious that the Board intended to charge in its complaint the various things it found the company guilty of, and then to urge upon us the insufficiency of the complaint, seems manifestly absurd. The complaint was sufficient.

■■■ In determining whether or not there is substantial evidence to support the facts found, we look only to the evidence that is favorable to the findings. These facts are supported by substantial evidence in the record.

The Board had called an election among the cabinet division employees of the company (Building No. 2) pursuant to a petition filed by the United Electrical, Radio & Machine Workers of America, affiliated with the Congress of Industrial Organizations, hereinafter called the union. The election went against the union. It thereupon filed an amendment to its complaint in which it charged the company with interfering with the election in violation of Section 8(1) of the National Labor Relations Act.

The union had started to organize in the company's plant in January, 1941. Up to that time, there had never been any union activity about the company's plant. The petition of the union requesting an investigation and certification of representation, pursuant to Section 9(c) of the Act, 29 U.S.C.A. § 159(c), was filed on April 18, 1941. On August 23, 1941, the Board ordered an election to be held September 16, 1941.

While the proceedings were pending for such investigation and the order for the election, the company, through its executive officers, entered upon a vigorous campaign among its employees to make sure the election went against the union. Before the Board had held its hearing on the union's petition of April 18, 1941, the company superintendent summoned to his office two employees, and after commenting upon their union buttons, inquired of them, in effect, what they expected to get out of the union that they couldn't get out of the management. The superintendent then proceeded to compare the advantages of the company's treatment of them as against what they might expect from the union.

Vice President Schroeder addressed the employees over a public address system during the lunch hour at the very time the Board was considering the union's petition. He stated that the union was not qualified as a representative of the employees because it was dominated by Communists. The information as to the domination of the union by Communists was derived from statements contained in the reports of the House Committee to Investigate Un-American Activities, commonly known as the Dies Committee, and from newspapers and magazines. Even these sources of doubtful authority admitted the president of the organization was not a Communist, but they did charge that two of the organizers were Communists. Mr. Schroeder then proceeded to exercise the coercive force of the company's economic power by telling the employees the details of a plan that they were working out for an increase in wages all along the line. He further stated that the company had recognized and would continue to recognize a local union.

On September 5, 1941, the President of the company, Mr. Carson, made a speech to the employees in which he belittled the

efforts of the union. He told the employees not to be misled by promises, that that was all the union could give them. He stated that the employees' future success would depend upon their co-operation with the management, and after pledging his co-operation, he told the employees, "The rest is up to you."

On September 13, 1941, President Carson sent a letter on the company's stationery to each employee in the cabinet division, advising that, " * * * The company does not have to agree to the union's demands, * * *" and definitely stated that if the union were recognized, the company would not bargain with it on certain things that are well-known subjects for collective bargaining. In this same letter, Mr. Carson likewise raised the question as to the Communistic leadership of the union.

The election was to be held on September 16, 1941, so Mr. Carson let no day go by without striking a blow in the company's continuous and vigorous campaign against the union. So, on September 15 he assembled the employees for a speech in which he reminded them that some of them had not been with the company very long, and were therefore unfamiliar with the fact that the company and its employees had traveled some pretty rough roads together, and that they had progressed and prospered. He stated that he could not make promises to exceed the reckless promises of the C. I. O., but that he would promise to carry on as he had in the past. He reminded the employees that the wage increases, Christmas bonuses and paid vacations were matters that the company had provided without any assistance from the union, and he stated that the company would determine whether or not they would continue and such continuance would not depend upon whether or not the union won. He said the employees could decide for themselves who had been responsible for the progress of the company, and, by the same token, who would be responsible for its progress in the future. Then he promised that if the union won the election:

" * * * I will never agree to any demands that they make if I feel that such demands are detrimental to the security of the business, to the maintenance of steady jobs, to steady income of our employees, or if such demands are beyond the company's ability to meet.

"Insistance (sic) upon any unreasonable demands might easily result in a strike, which would throw employees out of work. Loss of wages suffered during such a period would probably never be made up." Thus he made the subtle suggestion that unreasonable demands would likely be made by the union, and these would lead to strikes. He further promised that if the union won the election, the company and not the union would determine whether wage increases were possible. In other words, bargaining on this important matter of employee interest would not be approached by the company with an open mind. He then proceeded to disparage the method of collective bargaining by pointing to the union's record for strikes and acts of violence and exorbitant demands, as they appeared in the newspapers. Then he closed his speech with the challenge to the employees to choose between his leadership and the leadership of a union led by Communists.

While the executives were carrying on their vigorous speaking campaign, much after the fashion of a political campaign, certain supervisory officials of the company had offered one employee, Scheessele, a better job in return for his co-operation with the company, which obviously meant in its attitude toward the union. The superintendent of the company warned that everybody might be laid off in the cabinet division, and added that there would be plenty of jobs on the other side of the plant, but if these men went ahead and voted the union in, it would be impossible to transfer them over to the other side.

Just one week before the date set for the election, Foreman Doench asked employee Feldhaus whether he would better himself, and whether he would continue to receive vacations with pay, insurance, and Christmas bonuses, if the union got in the shop. Feldhaus replied that he thought he would, whereupon Foreman Doench asked him if he had any trade to fall back on, because if the union won the election, the "old man" was going to shut the cabinet division down. By the "old man," he meant the President of the company, Mr. Carson.

On September 11, 1941 another supervisory employee of the company, Duncan, stated to one of the union representatives, who was not an employee of the company: "Well, Payne, you will have to admit that we are carrying on the most intelligent campaign against the union ever carried on in this town."

We think this constitutes substantial evidence upon which the Board properly found the company had been guilty of interfering with, restraining and coercing the employees in their right to organize pursuant to Section 7 of the Act, and that the company was therefore in violation of Section 8(1).

■ The evidence clearly shows a purpose and plan to interfere, and interference by the company. It shows more. It shows intimidation and coercion. The subtle suggestion that if the union won the election, it could not do anything to protect the Christmas bonuses, insurance benefits, and vacations with pay which the company had theretofore provided, and the repeated assertion that if the union won the election, the company would go on as before, in effect ignoring the union as a bargaining agent, were calculated to intimidate the employees. Certainly the promise, in the midst of a campaign against the union, that the company was going to increase the pay of the employees; the statement that if the union got in the plant, the cabinet division might be closed down, and if the employees in that division were members of the union, they would not be accepted for employment elsewhere in the plant; and the threat that if the union got into the plant, the "old man" would close down the cabinet division, were calculated to intimidate and coerce the employees in the exercise of their right to freely select their bargaining agent. The campaign conducted by the company in opposition to the union had created a false issue between the employees and their employer. That false issue was that the employees were to choose between the company's executives and the union. That was not the issue. The issue was whom would the employees have for their bargaining agent. Obviously, the company's executives could not be. Who is to represent the employees as bargaining agent and the manner of selection are matters which belong exclusively to the employees. The statute has made it so, and it is the duty of the employer to keep hands off and maintain a strictly neutral attitude. This the company did not do in the instant case, and the Board's finding that it was guilty of unfair labor practices in violation of Section 8(1) of the Act is amply sustained by substantial evidence. National Labor Relations Board v. Stone, 7 Cir., 125 F.2d 752, 756; National Labor Relations Board v. Jahn & Ollier Co., 7 Cir.,

123 F.2d 589, 592; National Labor Relations Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, 756.

The company in its brief quoted from National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 479, 62 S.Ct. 344, 349, 86 L.Ed. 348, as follows: "If the utterances are thus to be separated from their background, we find it difficult to sustain a finding of coercion with respect to them alone." The company argues that this means that the addresses of the company's officers and the letter sent out by it should be separated from the other evidence in the case, and when considered alone, they do not constitute substantial evidence to support the finding of an unfair labor practice. The rest of the testimony concerning the statements made by superintendents and supervisory personnel of the company is incredible, says the company, because the Board did not believe the same witnesses concerning another issue tendered in the case, and found, as to that issue, in the company's favor.

By thus dividing the evidence into two categories, the company would destroy one at a time, and thereby destroy the support for the Board's findings. We do not understand the Supreme Court to say in the above case that the bulletin and speeches there in evidence *must* be considered separately. We understand the court to say that if the bulletin and the speeches stood alone, it was difficult for the court to sustain a finding of coercion with respect to them alone. The court then stated:

"Whether there are sufficient findings and evidence of interference, restraint, coercion, and domination, without reference to the bulletin and the speeches, or whether the whole course of conduct evidenced in part by the utterances was aimed at achieving objectives forbidden by the Act, are questions for the Board to decide upon the evidence.

"Here, we are not sufficiently certain from the findings that the Board based its conclusion with regard to the Independent upon the whole course of conduct revealed by this record. Rather it appears that the Board rested heavily upon findings with regard to the bulletin and the speeches, the adequacy of which we regard as doubtful."

The case was sent back for more definite findings as to whether the Board had

based its findings upon the whole course of conduct revealed in the record.

As to the second category, the company would question the credibility of the Board's witnesses who testified concerning the statements made by the superintendent and the supervisory officials. The credibility of these witnesses was for the Board, not us. Since the Board is the fact-finder, it is the judge of the credibility of the witnesses, and of the weight to be given to their testimony.

We do not think there is any justification for considering the evidence in two categories. It was the duty of the Board to consider the evidence as a whole. National Labor Relations Board v. Stone, supra. From a reading of the Board's findings, it is quite clear that the whole record was considered.

The respondent cites the case of Jefferson Electric Company v. National Labor Relations Board, 7 Cir., 102 F.2d 949, decided by this court. But in that case, there was complete neutrality on the part of the employer. In the case at bar, there was studied interference by a vigorous campaign interspersed with intimidation and coercion.

█ The company has challenged the Board's order in that it is not only against the company, its officers and agents, but also its successors and assigns, and asks that the words "successors and assigns" be stricken from the order. In accordance with our opinion heretofore rendered in National Labor Relations Board v. Bachelder, 7 Cir., 125 F.2d 387, 388, these words shall be stricken from the Board's order.

█ The company next insists that Paragraph 2(b) (2) should be amended by removing the semicolon at the end thereof and adding thereto the words: "or any other representatives of their own choosing," so that the paragraph as amended would read: "(b) * * * and (2) that the respondent's employees are free to become or remain members of United Electrical, Radio and Machine Workers of America, affiliated with the C. I. O., or any other representatives of their own choosing."

This amendment will be made in accordance with our holding in Reliance Manufacturing Company v. National Labor Relations Board, 7 Cir., 125 F.2d 311, at 322.

In addition to the posting of the usual notices, the Board ordered the company to distribute notices to *all* of its employees stating that the company would not engage in the unfair labor practices from which it was ordered to cease and desist. The company insists that this provision should be entirely eliminated from the order.

█ We do not think so. In its campaign against the union, the company had circularized the employees in the cabinet division (Building No. 2). The employees of this division were all that were directly affected by the company's unfair labor practices. Nevertheless, the speaking campaign was directed toward all of the employees. All of the employees knew there was an issue between the company and a part of its employees, growing out of the employees' right to organize. All must have felt the impact of the campaign of opposition. We do not think the Board's order as to the distribution of this notice to all of the employees is unreasonable, as it is no broader than the scope of the company's propaganda campaign. This part of the order will not be disturbed.

█ It is next insisted by the company that the cease and desist paragraph of the order, designated as Paragraph 1, should be limited to the unfair labor practices which the court shall find are supported by substantial evidence, and should not be general and blanket in form, citing National Labor Relations Board v. Express Publishing Company, 312 U.S. 426, 61 S.Ct. 693, 696, 85 L.Ed. 930. Paragraph 1 of the order reads: "Cease and desist from in any manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection, as guaranteed in Section 7 of the National Labor Relations Act."

Thus it will be seen that this paragraph of the order is not a blanket provision, but meets precisely the findings of the Board, which we have held are sustained by substantial evidence. In National Labor Relations Board v. Express Publishing Company, supra, the Board had found the employer guilty of "refusing to bargain collectively" in violation of Section 8(5), and had ordered the employer to cease and desist from all manner of interference. Obviously, this was too broad even if, as the Court pointed out, a violation of Section

8(5) "is also a technical violation of § 8 (1)." The specific violation was the wrongful practice to be met by that order.

Although a specific violation may be one of the reasons for finding a more general violation, it does not follow that for every specific violation there may be an order covering all general violations. For instance, all failures to bargain are interferences, but all interferences are not failures to bargain. An employer, for failure to bargain, could not be ordered to cease and desist from all other imaginable interference, intimidation or coercion, in the absence of a finding that the failure to bargain was under the circumstances also a violation of Section 8(1).

In the case at bar, the employer was not found guilty of a specific offense which might be an element of a general, more comprehensive offense; it was found guilty of the general, more comprehensive offense, and the order may be as broad as the offense. If a refusal to bargain is interference, then to order one to cease and desist from that act stops the only kind of interference the employer was guilty of. But where the employer is found guilty of interfering, intimidating and coercing, it may be required not only to cease and desist from doing the number of things found, but also from all manner of like things. As the Supreme Court said in the Express Publishing Company case:

"A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past."

We think that National Labor Relations Board v. Express Publishing Company, supra, and National Labor Relations Board v. Stone, 7 Cir., 125 F.2d 752, 757, are clearly distinguishable from the case at bar.

The Board's order will be modified in accordance with this opinion, and as modified will be enforced.

MAJOR, Circuit Judge, (concurring in part, dissenting in part).

I concur in the opinion, except as to Par. 1 of the order which, in my judgment, should be modified. It is to be noted that the language of this paragraph is identical with that stricken down by the Supreme Court in the Express Publishing Company case. If there be any plausibility in the reasoning of the majority, it is in the distinction sought to be made between the facts of that case and the instant one. The principle is not distinguishable.

The fallacy of the majority holding is best exemplified by appraising the result which follows approval of the paragraph in dispute. It undoubtedly means that respondent is enjoined from the commission of every conceivable act violative of Section 7. Thus, the entire category of unfair labor practices, not only those specifically enumerated in Section 8 but all others as well, is included. The language of the Supreme Court immediately following that quoted by the majority is more pertinent to the instant situation. The court said (312 U.S. at page 435, 61 S.Ct. at page 699, 85 L.Ed. 930): "But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. This Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated from those which a defendant has committed."

The fact that respondent was found guilty of interference, intimidation and coercion is no answer to this broad pronouncement where, as in the instant situation, the interference charged and found was as stated in the Board's brief, "a course of conduct to sway the result of a Board directed election." Notwithstanding the specific nature of the interference in issue, respondent is to be enjoined from every act which may constitute an interference, restraint or coercion, no matter how different in character it may be. As was said by the court in the Express case (312 U.S. at page 436, 61 S.Ct. at page 700, 85 L.Ed. 930): "The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past."

If I correctly grasp the import of the disputed paragraph, respondent henceforth

will operate under the peril of this injunctive edict. Thus any future labor dispute will be tried by this court under a citation for contempt rather than by hearing before the Labor Board. I do not think the Act contemplates such an incongruous result.