WERDEGAR, J.,
Concurring and Dissenting. — I join the court’s conclusions as to Arshavir Iskanian’s Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.) claims, which are not foreclosed by his employment contract or the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.). I disagree with the separate holding that the mandatory class action and class arbitration waivers in Iskanian’s employment contract are lawful. Eight decades ago, Congress made clear that employees have a right to engage in collective action and that contractual clauses purporting to strip them of those rights as a condition of employment are illegal. What was true then is true today. I would reverse the Court of Appeal’s decision in its entirety.
*398 I.
Employment contracts prohibiting collective action, first known as “ ‘ironclads,’ ” date to the 19th century. (Ernst, The Yellow-dog Contract and Liberal Reform, 1917-1932 (1989) 30 Lab. Hist. 251, 252 (The Yellow-dog Contract).) Confronted with collective efforts by workers to agitate for better terms and conditions of employment, employers responded by conditioning employment on the promise not to join together with fellow workers in a union. (Lincoln Union v. Northwestern Co. (1949) 335 U.S. 525, 534 [93 L.Ed. 212, 69 S.Ct. 251]; Silverstein, Collective Action, Property Rights and Law Reform: The Story of the Labor Injunction (1993) 11 Hofstra Lab. LJ. 97, 100.) This practice was “so obnoxious to workers that they gave these required agreements the name of ‘yellow dog contracts.’ ” (Lincoln Union, at p. 534.)
“Recognizing that such agreements in large part represent the superior economic position of the employer by virtue of which the theoretical freedom of an employee to refuse assent was illusory, and that such agreements therefore emptied of meaning the ‘right of collective bargaining,’ ” state legislatures and Congress sought to stem the practice, enacting statutes that prohibited conditioning employment on a compulsory contractual promise not to unionize. (Frankfurter & Greene, The Labor Injunction (1930) p. 146.) These efforts were initially unsuccessful; first state courts, and then the Lochner-era[1] United States Supreme Court, struck down the bans as an infringement on liberty of contract. (Coppage v. Kansas (1915) 236 U.S. 1, 9-14 [59 L.Ed. 441, 35 S.Ct. 240]; Adair v. United States (1908) 208 U.S. 161, 172-176 [52 L.Ed. 436, 28 S.Ct. 277, 5 Ohio L.Rep. 605]; Frankfurter & Greene, at pp. 146-148; The Yellow-dog Contract, supra, 30 Lab. Hist, at p. 252.) When the Supreme Court gave a clear imprimatur to yellow-dog contracts in Hitchman Coal & Coke Co. v. Mitchell (1917) 245 U.S. 229 [62 L.Ed. 260, 38 S.Ct. 65], upholding an injunction against collective organizing efforts on the ground that the contracts granted employers a property right secure from union interference, the use of contractual bans on collective action blossomed. (Frankfurter & Greene, at pp. 148-149; The Yellow-dog Contract, at pp. 253-256.) Through the use of such terms, “[a]ny employer willing to compel employee acquiescence could effectively foreclose all union organizational efforts directed at his business.” (Winter, Jr., Labor Injunctions and Judge-made Labor Law: The Contemporary Role of Norris-LaGuardia (1960) 70 Yale L.J. 70, 72, fn. 14.)
*399 In the 1930’s, Congress tried again to outlaw contractual bans on collective action. A bill drafted by then Professor Felix Frankfurter and others[2] was swiftly and overwhelmingly approved in both houses and enacted as the Norris-LaGuardia Act of 1932. (Bremner, The Background of the Norris-La Guardia Act (1947) 9 The Historian 171, 174-175.) Section 2 of the act declared as the public policy of the United States employees’ right to engage in collective activity, free from employer restraint or coercion: “Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, ... it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .” (29 U.S.C. § 102, italics added.) Congress recognized the inability of a “single laborer, standing alone, confronted with such far-reaching, overwhelming concentration of employer power” to “negotiate or to exert any influence over the fixing of his wages or the hours and conditions of his labor,” the necessary corrective to be “[t]he right of wage earners to organize and to act jointly in questions affecting wages [and the] conditions of labor,” and, as the solution, “specific legislative action” to preserve workers’ “freedom in association to influence the fixing of wages and working conditions.” (Sen.Rep. No. 163, 72d Cong., 1st Sess., p. 9 (1932); see generally id., at pp. 9-14.) Arguing for passage, the act’s cosponsor, Senator George Norris, explained the measure was needed to end a regime in which “the laboring man .... must singly present any grievance he has.” (Remarks of Sen. Norris, Debate on Sen. No. 935, 72d Cong., 1st Sess., 75 Cong. Rec. 4504 (1932).)
To that end, section 3 of the Norris-LaGuardia Act was “designed to outlaw the so-called yellow-dog contract.” (H.R.Rep. No. 669, 72d Cong., 1st Sess., p. 6 (1932); accord, Sen.Rep. No. 163, supra, at pp. 15 — 16.) “[T]he vice of such contracts, which are becoming alarmingly widespread,” was that they rendered collective action and unions effectively impossible; “[i]ndeed, that is undoubtedly their purpose, and the purpose of the organizations of employers opposing” the Norris-LaGuardia Act. (H.R.Rep. No. 669, at p. 7.) If such *400 contracts, requiring a waiver of workers’ rights of free association, were given enforcement in the courts, “collective action would be impossible so far as the employee is concerned by virtue of the necessity of signing the character of contract condemned, which prevents a man from joining with his fellows for collective action; and the statement . . . that ‘it has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work’ would become an empty statement of historical fact.” (Ibid., quoting Texas & N. O. R. Co. v. Ry. Clerks (1930) 281 U.S. 548, 570 [74 L.Ed. 1034, 50 S.Ct. 427].) Accordingly, the NorrisLaGuardia Act declared yellow dog contracts “to be contrary to the public policy of the United States” and unenforceable in any court of the United States. (29 U.S.C. § 103.)
Three years later, Congress expanded on these proscriptions in the National Labor Relations Act (commonly known as the Wagner Act after its author, Sen. Robert F. Wagner). (Pub.L. No. 74-198 (July 5, 1935) 49 Stat. 449, codified as amended at 29 U.S.C. §§ 151-169.) The public policy underlying the act was the same as that motivating the Norris-LaGuardia Act: “protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.” (29 U.S.C. § 151.) To ensure that end, the Wagner Act granted employees, inter alla, “the right ... to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .” (29 U.S.C. § 157 (also known as section 7).)[3] Employers were forbidden “to interfere with, restrain, or coerce employees in the exercise of’ their right to engage in concerted, collective activity. (29 U.S.C. § 158(a)(1).) Inter alla, these provisions were a “logical and imperative extension of that section of the Norris-La Guardia Act which makes the yellow-dog contract unenforceable in the Federal courts.” (Nat. Labor Relations Act of 1935, Hearings before House Com. on Labor on H.R. No. 6288, 74th Cong., 1st Sess., p. 14 (1935), statement of Sen. Wagner; accord, remarks of Sen. Wagner, Debate on Sen. No. 1958, 74th Cong., 1st Sess., 79 Cong. Rec. 7570 (daily ed. May 15, 1935); see H.R.Rep. No. 1147, 74th Cong., 1st Sess., supra, at p. 19.)[4] Recognizing as clear “the legality of collective action on the part of employees in order to safeguard their proper interests,” the post-Lochner *401 Supreme Court now upheld against constitutional challenge Congress’s “safeguard” of this right. (Labor Board v. Jones & Laughlin (1937) 301 U.S. 1, 33-34 [81 L.Ed. 893, 57 S.Ct. 615].)
In the years since the Wagner Act’s passage, the Supreme Court, Courts of Appeals, and National Labor Relations Board have conclusively established that the right to engage in collective action includes the pursuit of actions in court. (Eastex, Inc. v. NLRB (1978) 437 U.S. 556, 565-566 [57 L.Ed.2d 428, 98 S.Ct. 2505] [the Wagner Act’s “ ‘mutual aid or protection’ clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums . ..”]; Brady v. National Football League (8th Cir. 2011) 644 F.3d 661, 673 [“a lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment is ‘concerted activity’ under § 7 ...” of the Wagner Act]; Mohave Electric Cooperative (1998) 327 N.L.R.B. 13, 18, enforced by Mohave Elec. Co-op., Inc. v. N.L.R.B. (D.C. Cir. 2000) 340 U.S. App.D.C. 391, 206 F.3d 1183, 1188-1189 [same]; Altex Ready Mixed Concrete Corp. (1976) 223 N.L.R.B. 696, 699-700, enforced by Altex Ready Mixed Concrete Corp. v. N.L.R.B. (5th Cir.) 542 F.2d 295, 297 [same]; Leviton Manufacturing Company, Inc. v. N.L.R.B. (1st Cir. 1973) 486 F.2d 686, 689 [same].) This right extends to the filing of wage and hour class actions (United Parcel Service, Inc. (1980) 252 N.L.R.B. 1015, 1018, enforced by N.L.R.B. v. United Parcel Service, Inc. (6th Cir. 1982) 677 F.2d 421), including wage class actions filed by former employees like Iskanian (see Harco Trucking, LLC (2005) 344 N.L.R.B. 478, 482). The Wagner Act thus prohibits, as an unfair labor practice, employer interference with the ability of current or former employees to join collectively in litigation.
II.
Today’s class waivers are the descendants of last century’s yellow dog contracts. (See D.R. Horton & Cuda (Jan. 3, 2012) 357 N.L.R.B. No. 184, p. 6.) CLS Transportation’s adhesive form contract includes a clause prohibiting Iskanian, like all its employees, from pursuing class or representative suits or class arbitrations.[5] Thus, Iskanian may not file collectively with *402 fellow employees a suit or an arbitration claim challenging any of CLS’s employment practices or policies. Patently, the effect of the clause is to prevent employees from making common cause to enforce rights to better wages and working conditions. In this, the clause is indistinguishable from the yellow dog contracts prohibited by the Norris-LaGuardia and Wagner Acts. Indeed, the whole point of protecting a right to collective action is to allow employees to do precisely what CLS Transportation’s clause forbids— band together as a group to peaceably assert rights against their employer.
That the class waiver is without effect necessarily follows. An employer may not by contract require an employee to renounce rights guaranteed by the Wagner Act (Nat. Licorice Co. v. Labor Board (1940) 309 U.S. 350, 359-361 [84 L.Ed. 799, 60 S.Ct. 569]; see id. at p. 364 [“employers cannot set at naught the National Labor Relations Act by inducing their workmen to agree not to demand performance of the duties which it imposes . . .”]), and this includes a contract clause requiring an employee to resolve disputes in individual, binding arbitration. Such a clause “is the very antithesis of collective bargaining [and] . . . impose[s] a restraint upon collective action.” (National Labor Relations Board v. Stone (7th Cir. 1942) 125 F.2d 752, 756; see Barrow Utilities & Electric (1992) 308 N.L.R.B. 4, 11, fn. 5 [“The law has long been clear that all variations of the venerable ‘yellow dog contract’ are invalid.”].) The restriction in Iskanian’s contract thus directly contravenes federal statutory labor law and is invalid on its face. A contract clause that violates the Wagner Act is unenforceable. (Kaiser Steel Corp. v. Mullins (1982) 455 U.S. 72, 83-86 [70 L.Ed.2d 833, 102 S.Ct. 851]; J. I. Case Co. v. Labor Board (1944) 321 U.S. 332, 337 [88 L.Ed. 762, 64 S.Ct. 576] [private contracts that conflict with the Wagner Act “obviously must yield or the Act would be reduced to a futility”].) Iskanian may not be prevented, on the basis of his contract, from proceeding with a putative class action.
III.
Notwithstanding this authority, CLS Transportation invokes the FAA as grounds for upholding the class waiver.
In the early part of the 20th century, merchants faced judicial hostility to predispute arbitration agreements they entered with their fellow merchants; routinely, the courts declined to enforce such agreements, relying on the common law rule that specific enforcement of agreements to arbitrate was unavailable. (H.R.Rep. No. 96, 68th Cong., 1st Sess., pp. 1-2 (1924); Wasserman, Legal Process in a Box, or What Class Action Waivers Teach Us *403 About Law-making (2012) 44 Loy. U. Chi. L.J. 391, 395.) In 1925, Congress enacted the FAA in response. Its purpose was to have arbitration agreements “placed upon the same footing as other contracts.” (H.R.Rep. No. 96, at p. 1.)
Section 2 of the FAA, its “primary substantive provision” (Moses H. Cone Hospital v. Mercury Constr. Corp. (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 103 S.Ct. 927]), makes this point explicit: An arbitration agreement “shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contraer (9 U.S.C. § 2, italics added). Here, we deal with a provision — the waiver of the statutorily protected right to engage in collective action — that would be unenforceable in any contract, whether as part of an arbitration clause or otherwise. The FAA codifies a nondiscrimination principle; “[a]s the ‘saving clause’ in § 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so.” (Prima Paint v. Flood & Conklin (1967) 388 U.S. 395, 404, fn. 12 [18 L.Ed.2d 1270, 87 S.Ct. 1801].) That purpose is not upset by precluding, in arbitration clauses and employment contracts alike, mandatory class waivers forfeiting the right to engage in collective action, a right foreshadowed by section 3 of the Norris-LaGuardia Act and guaranteed by section 7 of the Wagner Act. Accordingly, there is no conflict between the FAA and the Norris-LaGuardia and Wagner Acts, nor is there anything in the FAA that would permit disregard of the substantive rights guaranteed by those later enactments.
Were one to perceive a conflict, the express text of the Norris-LaGuardia Act would resolve it. The 1932 act supersedes prior law, including any contrary provisions in the 1925 FAA: “All acts and parts of acts in conflict with the provisions of this chapter are repealed.” (29 U.S.C. § 115.) The effect of this provision, in combination with section 3 (29 U.S.C. § 103) banning yellow dog contracts and the FAA’s section 2 (9 U.S.C. § 2), subjecting arbitration agreements to the same limits as other contracts, is to render equally unenforceable contractual obligations to forswear collective action in regular employment agreements and in employment arbitration agreements.
Brief reflection on the purposes underlying the Norris-LaGuardia Act and Wagner Act demonstrates why this must be so. A strike for better wages and working conditions is core protected activity. (Labor Board v. Erie Resistor Corp. (1963) 373 U.S. 221, 233-235 [10 L.Ed.2d 308, 83 S.Ct. 1139]; Automobile Workers v. O’Brien (1950) 339 U.S. 454, 456-457 [94 L.Ed. 978, 70 S.Ct. 781].) So too is a walkout. {Labor Bd. v. Washington Aluminum Co. (1962) 370 U.S. 9, 14-17 [8 L.Ed.2d 298, 82 S.Ct. 1099]; N.L.R.B. v. McEver Engineering, Inc. (5th Cir. 1986) 784 F.2d 634, 639; Vic Tanny Intern., Inc. v. N.L.R.B. (6th Cir. 1980) 622 F.2d 237, 240-241.) But the expressly declared *404 fundamental purpose of the Wagner Act is to minimize industrial strife. (29 U.S.C. § 151 [“[P]rotection by law of the right of employees to organize and bargain” is necessary to “promote[] the flow of commerce by removing certain recognized sources of industrial strife and unrest”]; see Brooks v. Labor Board (1954) 348 U.S. 96, 103 [99 L.Ed.2d 125, 75 S.Ct. 176] [“The underlying purpose of [the Wagner Act] is industrial peace.”]; Atleson, Values and Assumptions in American Labor Law (1983) p. 40 [“The most common argument in favor of the Wagner Act was that it would reduce industrial strife.”].) The Wagner Act “seeks, to borrow a phrase of the United States Supreme Court, ‘to make the appropriate collective action (of employees) an instrument of peace rather than of strife.’ ” (H.R.Rep. No. 1147, 74th Cong., 1st Sess., supra, at p. 9.) If a class waiver provision in an arbitration agreement were deemed enforceable, Iskanian and other employees would be protected if they elected to protest through strikes or walkouts but precluded from resolving grievances through peaceable collective action — a result precisely opposite to the reduction in industrial strife at the heart of the Wagner Act’s goals. Congress would not have favored less peaceable means over more peaceable ones.
Alternatively, if the device of inserting a collective action ban in an arbitration clause were enough to insulate the ban from the Norris-LaGuardia and Wagner Acts’ proscriptions, employers could include in every adhesive employment contract a requirement that all disputes and controversies, not just wage and hour claims, be resolved through arbitration and thus effectively ban the full range of collective activities Congress intended those acts to protect. Such a purported harmonizing of the various acts would gut the labor laws; the right to “ ‘collective action would be a mockery.’ ” (H.R.Rep. No. 669, 72d Cong., 1st Sess., supra, at p. 7.) When Congress invalidated yellow dog contracts and protected the right to engage in collective action, it could not have believed it was conveying rights enforceable only at the grace of employers, who could at their election erase them by the simple expedient of a compelled waiver inserted in an arbitration agreement.
CLS Transportation argues AT&T Mobility LLC v. Concepcion (2011) 563 U.S. 333 [179 L.Ed.2d 742, 131 S.Ct. 1740] and CompuCredit Corp. v. Greenwood (2012) 565 U.S._[181 L.Ed.2d 586, 132 S.Ct. 665] save its class waiver. Neither does.
Concepcion considered whether as a matter of obstacle preemption the FAA foreclosed a state law unconscionability rule applicable to class waivers in consumer contracts. (AT&T Mobility LLC v. Concepcion, supra, 563 U.S. at p._[131 S.Ct. at p. 1746].) It did not speak to the considerations entailed in reconciling the FAA with other coequal federal statutes. Nor did it address *405 any of the particulars of Congress’s subsequent labor legislation codifying employees’ substantive rights to engage in collective action, rights not shared by consumers.
CompuCredit Corp. v. Greenwood, supra, 565 U.S._[132 S.Ct. 665] is similarly of no assistance. There, the Supreme Court reaffirmed that to determine whether the FAA’s presumption in favor of enforcing arbitration clauses applies to a given claim, one must ask whether the presumption has been “ ‘overridden by a contrary congressional command’ ” in other federal law. (Id. at p.__ [132 S.Ct. at p. 669].) The claims at issue there arose under a federal law that guaranteed consumers notice of a “ ‘ “right to sue.” ’ ” (Ibid., quoting 15 U.S.C. § 1679c(a).) Had Congress intended to preclude arbitration as a suitable forum under the applicable act, “it would have done so in a manner less obtuse” than one offhand reference to a right to sue. (CompuCredit, at p. _ [132 S.Ct. at p. 672].) In contrast, the NorrisLaGuardia Act and Wagner Act present no similar difficulties for discerning a contrary congressional command. Such a command may be evident from “the text of the [other statute], its legislative history, or an ‘inherent conflict’ between arbitration and the [other statute’s] underlying purposes.” (Gilmer v. Interstate/Johnson Lane Corp. (1991) 500 U.S. 20, 26 [114 L.Ed.2d 26, 111 S.Ct. 1647].) Each such source supplies support here: the conclusion that class waivers are foreclosed arises not from inferences gleaned from a lone phrase, as in CompuCredit, but from the explicit text, legislative history and core purpose of the acts, all establishing the right to collective action and the illegality of compelled contractual waivers of that right. (See ante, pts. I. & II.)
Refusing to enforce a National Labor Relations Board order finding a class waiver violative of the Wagner Act, a divided Fifth Circuit reached a contrary conclusion. (D.R. Horton, Inc. v. N.L.R.B. (5th Cir. 2013) 737 F.3d 344 (Horton II), declining to enforce D.R. Horton & Cuda, supra, 357 N.L.R.B. No. 184.) The majority’s analysis assumed a congressional command superseding the FAA could come only from “the general thrust of the [Wagner Act] — how it operates, its goal of equalizing bargaining power” (Horton II, at p. 360) and the “congressional intent to ‘level the playing field’ between workers and employers” (id. at p. 361), sources the majority found insufficient. One need not look to such generalized and abstract indications. As discussed, the FAA subordinates arbitration agreements to generally applicable bars against contract enforcement (9 U.S.C. § 2), and the Wagner Act by its text bars employers from contractually conditioning employment on waiver of the right to engage in collective action (29 U.S.C. §§ 157, 158(a)(1); see Nat. Licorice Co. v. Labor Board, supra, 309 U.S. at pp. 359-361).
*406 Horton II also took comfort in the fact rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.), governing class actions, was not adopted until 1966. (Horton II, supra, 737 F.3d at p. 362.) But that the most prevalent current form of collective litigation is recent does not mean the Wagner Act at its inception did not shield from waiver the right to collective litigation in whatever manner available. Collective actions via the common law doctrine of virtual representation, based on equity principles, are of much older vintage than rule 23. (Arias v. Superior Court (2009) 46 Cal.4th 969, 988-989 [95 Cal.Rptr.3d 588, 209 P.3d 923] (cone. opn. of Werdegar, J.).) “The 74th Congress knew well enough that labor’s cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context. It recognized this fact by choosing, as the language of § 7 makes clear, to protect concerted activities for the somewhat broader purpose of ‘mutual aid or protection’ as well as for the narrower purposes of ‘self-organization’ and ‘collective bargaining.’ ” (Eastex, Inc. v. NLRB, supra, 437 U.S. at p. 565.) The broad language of the Wagner Act shields concerted activity for mutual aid or protection by whatever means pursued, including through peaceable collective suits.
In the end, CLS Transportation’s argument rests on the notion that the FAA should be interpreted to operate as a super-statute, limiting the application of both past and future enactments in every particular. “[M]en may construe things after their fashion/Clean from the purpose of the things themselves.” (Shakespeare, Julius Caesar, act I, scene 3, lines 34-35.) So it is with this view of the FAA. The text and legislative history of the Norris-LaGuardia and Wagner Acts, passed by legislators far closer in time to the FAA than our current vantage point, show no such deference. The right of collective action they codify need not yield.
I respectfully dissent.

 Lochner v. New York (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539].

 See Frankfurter & Greene, The Labor Injunction, supra, page 226 and footnote 61; id. at pages 279-288 (draft bill); Fischl, Self, Others, and Section 7: Mutualism and Protected Protest Activities Under the National Labor Relations Act (1989) 89 Colum. L.Rev. 789, 846-849.

 Congress took to heart, as it had in the Norris-LaGuardia Act, Chief Justice Taft’s admonition that because a “single employee was helpless in dealing with an employer,” collective action “was essential to give laborers [the] opportunity to deal on equality with their employer.” (Amen Foundries v. Tri-City Council (1921) 257 U.S. 184, 209 [66 L.Ed. 189, 42 S.Ct. 72], quoted in H.R.Rep. No. 1147, 74th Cong., 1st Sess., p. 10 (1935) and H.R.Rep. No. 669, 72d Cong., 1st Sess., supra, at p. 7.)

 Senator Wagner’s “intent was the intent of Congress, for unlike most other major legislation, this statute was the product of a single legislator. Although Wagner received *401 assistance from various sources, he fully controlled the bill’s contents from introduction to final passage.” (Morris, Collective Rights as Human Rights: Fulfilling Senator Wagner’s Promise of Democracy in the Workplace — The Blue Eagle Can Fly Again (2005) 39 U.S.F. L.Rev. 701, 709.)

 The clause provides: “[EJxcept as otherwise required under applicable law, (1) EMPLOYEE and COMPANY expressly intend and agree that class action and representative action procedures shall not be asserted, nor will they apply, in any arbitration pursuant to this Policy/Agreement; (2) EMPLOYEE and COMPANY agree that each will not assert class action or representative action claims against the other in arbitration or otherwise; and (3) each of EMPLOYEE and COMPANY shall only submit their own, individual claims in arbitration *402 and will not seek to represent the interests of any other person.” (“Proprietary Information and Arbitration Policy/Agreement,” 1 16(b) (Iskanian’s contract).)